[Crim. No. 732. Fourth Dist. Apr. 27, 1950.]

THE PEOPLE, Respondent, v. BRUCE BENTLEY SHERMAN, Appellant.

Jerome Weber and Melvin B. Thale for Appellant.

Fred N. Howser, Attorney General, and Howard S. Goldin, Deputy Attorney General, for Respondent.

GRIFFIN, J. — Defendant Bruce Sherman and his wife, Mae, were jointly charged in count 1 of an information with the crime of arson in that they feloniously set fire to the Duo-Arts Upholstery Shop, in Calexico, in violation of section 447a of the Penal Code and in a second count with attempting to burn insured property with intent to defraud an insurer, in violation of section 548 of the Penal Code. After a plea of not guilty the jury returned a verdict of guilty on each count as to defendant Bruce Sherman, and not guilty as to his wife.

The appealing defendant now claims first that there was insufficient evidence to establish the corpus delicti and to allow introduction of extrajudicial statements of the defendant at the trial. This calls for a rather minute relation of the facts presented.

Defendant had been a fireman in Los Angeles County for several months. In 1947, he rented a store in a hotel build-

ing in Calexico to carry on his upholstery business. The store contained a large display and workroom, together with a small washroom at the rear thereof which was about 4 by 5 feet square. The floor and two walls of the washroom were wooden. The other two walls were of brick. There was a window opening to the outside which was covered by a cardboard and screen. About 8:15 a. m. on February 23, 1949, a witness observed smoke coming from the washroom. An alarm brought the fire department. The fire chief described finding smoke coming from that window. The screen and cardboard were removed. He then observed a small glow from embers on the floor. Water fog was applied by hose through the window. He found all doors entering the storeroom to be locked. He broke in and found the building was "charged" with dense smoke and that the fire was in the washroom. The door entering it was partially opened. He found incomplete combustion of a material called coco fiber lying on top of the wooden surface of the floor and near the west wall which covered a space of about 10 by 24 inches. Two or three bales of coco fiber were up against the wooden wall of the washroom. There were burned marks on the floor and some smoke marks on the wall. There was about one quart of charred residue of coco fiber, as well as small pieces of paper, remaining on the floor after the glow was extingushed. It was found that heat still remained in the wooden floor boards and the walls. The chief then found a removable board in the floor about 24 inches in length and 4 inches in width located about 12 to 16 inches from the place where he found the fire on the floor of the washroom. He removed this board and found fire underneath the floor. The removable board was charred underneath, and more residue of incomplete combustion of coco fiber and ash was found covering a space of about 18 inches by 3 inches, which ran counterwise to the space produced by the uplifting of the board in the floor. No mechanical devices, electric wiring or ground wires were found which might possibly have started a fire in that vicinity. Three clean, fresh and partially burned wooden matches were found about 8 inches from the debris under the floor. A partially charred board was found near the debris. The floor joists and floor boards were charred underneath.

An expert witness, produced by the People, testified that he investigated the fire and that there were two separate and

distinct burned and charred areas, one under the floor and the other in the washroom on the floor as described by the fire chief; that the floor had been damp for some period of time prior to the application of the water fog and that such dampness, in addition to the lack of ventilation found to exist, would have a tendency to retard ignition of the wood products by the fire. He gave as his opinion that from the condition he observed, the fire was burning not less than three hours prior to the time of its discovery; that the type of fiber burned had a tendency to smoke when ventilation was not favorable, and that it would remain smothered to some extent before it was completely incinerated. Defendant was seen leaving the building and premises about 4:30 a. m., at which time he left for Los Angeles. About three hours later the fire was discovered.

The evidence sufficiently established the corpus delicti for the purpose of admitting the extrajudicial statements of the defendant. (*People* v. *Hubbell,* 54 Cal.App.2d 49, 57 [128 P.2d 579]; *People* v. *Seymour,* 54 Cal.App.2d 266, 275 [128 P.2d 726]; *People* v. *Kaye,* 43 Cal.App.2d 802, 809 [111 P.2d 679]; *People* v. *Walden,* 75 Cal.App. 565, 567 [243 P. 25]; *People* v. *Haggerty,* 46 Cal. 354, 355; *People* v. *Simpson,* 50 Cal. 304, 306; *People* v. *Holman,* 72 Cal.App.2d 75 [164 P.2d 297]; *People* v. *Cape,* 79 Cal.App.2d 284, 289 [179 P.2d 426].) Incendiary origin of a fire is generally established by circumstantial evidence such as the finding of separate and distinct fires on the premises. (*People* v. *Saunders,* 13 Cal. App. 743, 747 [110 P. 825]; *People* v. *Patello,* 125 Cal.App. 480, 482 [13 P.2d 1068].)

As to the second count the evidence shows that defendant had a policy of fire insurance of $6,000 on his stock and fixtures, which policy would expire on March 21, 1949; that on February 2, 1949, he had paid for and received an additional policy, in another company, for the same amount, on the same stock and fixtures located in the upholstery shop, upon the representation that his inventory showed, on January 1, 1949, about $14,000 of stock and fixtures on hand and that he was underinsured. One witness testified that the wholesale value of the stock on hand, after the fire, was about $1,470, plus $1,493, the value of the fixtures. Defendant conceded that at the time of the fire he was indebted to his landlord for rent of the premises in the sum of $800, as evidenced by a judgment obtained against him.

When Mrs. Sherman was called on the phone the morning of February 23d, she stated that her husband had departed for Los Angeles on February 22, at about 9 p. m. However, on the witness stand, she stated she was mistaken, that her husband left home about 4 a. m. on February 23; that she lied to the investigators because she was nervous and upset when she made that statement; that there was but one set of keys to the shop and she had them in her possession that morning.

Defendant was notified, in Los Angeles, of the fire. He was interviewed there by investigators of the fire department and. stated he had $10,000 to $12,000 worth of stock on hand; that he thought that the first policy expired on March 1, 1949, and that he obtained the second policy to replace the old one; that from 9 p. m. on February 22, to 4:30 a. m. on February 23, he was with a woman in his place of business; that he locked the premises, picked up a friend, and went to San Diego and thence to Los Angeles, where he visited his son; that his son informed him of the fire; that his lease on the place had just been canceled and that he was then on a month to month basis. The investigator stated to defendant that he thought it odd that defendant would leave Calexico at that hour of the morning, and particularly the morning of the fire; that defendant said: ''Well, that is my story and I am going to stick to it.'' On his return to Calexico defendant was again questioned and asked when he had last been in the upholstery shop prior to the fire and he stated approximately 5:40 p. m. on February 22; that he had arisen about 4 o'clock a. m. on February 23; that he drove his truck to pick up a friend; that he had taken a roundabout route in order to pass his upholstery shop and check whether the lights were out; that slightly after 4:30 a. m. he proceeded out of town. He was then asked whether he stopped in front of his store or at his store and defendant stated that he positively had not. At this point the investigator told defendant that he was lying and said to him: ''Sherman, we can put you out of your car in front of that building,'' whereupon defendant declared: ''Well, I might as well tell you, I did go in the building.'' Defendant then stated that he had gone into the shop to pick up some checks. The investigator inquired as to whether defendant had ever had any fires and defendant answered: ''This is my first fire.'' The investigator then accused defendant of having set this fire and stated the facts pointed to an incendiary fire and to the fact

that defendant had set it. He said: "Bruce, it points right to you. . . . Now what have you got to say for yourself?" Defendant replied: "Well, all I have got to say is you are going to have to prove it." Defendant, on the witness stand, admitted he first told the officers that on the evening of the fire he had just "driven past" his shop but did not stop, and that his wife had called on the phone when he was in Los Angeles and they "fixed up" a story about his leaving Calexico at 9 o'clock the night before. Defendant endeavored to account for the inconsistent statements made by him and claimed that the woman who was with him that night was his wife and they were in their own home. He produced testimony as to the condition of the shop and said that there was nothing unusual about coco fiber being strewn all over the floor in any upholstery shop; that if he had intended starting a fire he would not have started it in or under a water-soaked floor; that no actual damage was done by reason of the fire; that he did not set the fire and did not intend to defraud any insurance company. Without a further summarization, the evidence sufficiently supports the verdict and finding of the jury as to the second count.

■ The next complaint is that the court erred in not permitting counsel for defendant to cross-examine the fire chief as to his bias and prejudice against defendant. On cross-examination counsel sought to elicit from the witness certain facts. The court sustained the objection and he then made an offer of proof that defendant and the chief were once members of the fire department together and were business associates in the upholstery business; that the defendant aided the chief in securing his position; that while defendant was a member of the Calexico Advancement Organization, a claimed group of individuals opposed to the administration of the city of Calexico, the chief requested the defendant to submit a petition recommending him for the office of police chief, as well as fire chief; that defendant agreed to submit his petition to the organization but that the defendant disapproved of the application because the chief was unfit for the job and that the witness made threats against the defendant and made demands for money. Defendant was permitted to produce evidence showing most of the facts contained in the offer of proof, and the chief did testify that he and defendant had been in business together and that defendant owed him $1,200, but the defendant denied that he owed the debt.

Defendant himself testified that the chief told him that defendant had better get out of the political organization with which he was affiliated and that there was not room in town for both of them; and that the chief told him he was going to run him out of town. The chief denied making any such statements or that he had any words with the defendant or that he was biased or prejudiced toward him. There was some evidence admitted about a petition claimed to have been presented to the defendant by the fire chief, soliciting support of the organization for his appointment as chief of police, and that defendant refused to have such a petition signed or presented. Defendant's complaint is that he should have been allowed to place the form of petition in evidence and to show more in detail the political ramifications between the defendant and the witness. The trial of the action took nearly two weeks of time and the reporter's transcript contains over 900 pages. It cannot be said, from a reading of the transcript, that counsel for defendant was unduly limited in his cross-examination where he was afforded the opportunity of showing and did show the facts attempted to be elicited in the offer of proof, by other witnesses, as well as by the testimony of himself. While further cross-examination on the subject should have been allowed (*Silvey* v. *Hodgdon,* 48 Cal. 185, 188; *People* v. *Blackwell,* 27 Cal. 65, 68), no abuse of discretion appears and no prejudicial error resulted where defendant was permitted to prove by other witnesses the facts set forth in the offer of proof (*People* v. *Conness,* 150 Cal. 114 [88 P. 821].) The latitude permitted in the cross-examination of a witness is very largely in the discretion of the trial court (*People* v. *Wong Toy,* 189 Cal. 587, 591 [209 P. 543]; *People* v. *Svendsen,* 25 Cal. App. 1, 4 [142 P. 861].)

█ It is next contended that the court was in error in not permitting defendant's counsel to conduct certain experimental tests in the presence of the jury. It was the People's contention that the fire was set about 4:30 a. m.; that it smouldered and did not become noticeable until about 8 a. m. due to the atmospheric conditions of the room, its dampness, and the nature of the burning propensities of coco fiber. Counsel brought into court a bucket, a cover, coco fiber, a spray-gun filled with water, and a piece of metal, and wanted a witness to light the fiber in the courtroom to demonstrate its burning propensities. The court sustained the objection to

such a test, apparently on the theory that the experiment would not be conducted under similar conditions to those that existed at the upholstery shop. Offer was then made to show that such a test had been previously made outside of the court-room by the witness and that it showed the burning propensities of the coco fiber. The admission of such evidence is largely a matter of discretion with the trial court (*People* v. *Levine*, 85 Cal. 39 [22 P. 969, 24 P. 631] ; *People* v. *Mondshine*, 132 Cal.App. 395 [22 P.2d 779].) In the first instance the trial court may have had regard for the comfort of the jurors as well as the inflammability of the courthouse in determining whether such a test should be conducted in the courtroom. It does not appear that the test made out of court was under similar conditions to those prevailing at the upholstery shop. (*People* v. *Black*, 45 Cal.App.2d 87, 103 [113 P.2d 746] ; *People* v. *Wagner*, 29 Cal.App. 363, 368 [155 P. 649] ; *People* v. *Halbert*, 78 Cal.App. 598, 607 [248 P. 969].) No abuse of discretion appears.

The next error claimed is that the district attorney was guilty of prejudicial misconduct in offering testimony to show that defendant had had other fires. This claim appears to be more serious than others. Counsel for defendant, anticipating the testimony about to be offered by the prosecution, approached the bench and requested the People to make an offer of proof so the court could be informed of the nature of the testimony about to be produced. The trial court denied the request. Subsequently the witness was asked: "Do you know whether or not the defendant . . . had any other fires?" The witness, before an objection could be made, immediately answered: "Two." A motion to strike the answer was granted. A motion for mistrial was denied. It is argued that since the district attorney knew, beforehand, that the answer sought to be induced by the question was not admissible,he was not acting in good faith and was guilty of prejudicial misconduct, citing *People* v. *Angelopoulos*, 30 Cal.App.2d 538, 549 [86 P.2d 873]. The prosecuting attorney also asked defendant's wife, on cross-examination, if she "had any other fires." The court in both instances sustained an objection to those and similar questions and admonished the jury to disregard them and stated that "You are to regard matters ordered stricken as though they never had been mentioned."

In *People* v. *Lee Chuck*, 78 Cal. 317, 329 [20 P. 719], it is said:

"Equally with the court, the district attorney, as a representative of law and justice, should be fair and impartial. He should remember that it is not his sole duty to convict, and that to use his official position to obtain a verdict by illegitimate and unfair means is to bring his office and the courts into distrust." (See, also, *People* v. *Wells,* 100 Cal. 459, 462 [34 P. 1078].)

It is true that the trial court was not obligated to rule upon the so-called demand for offer of proof on the part of the prosecution. (*People* v. *Kemp,* 139 Cal.App. 48, 51 [34 P.2d 502].) The complaint goes to the question of good faith of the prosecutor. The district attorney endeavored to claim good faith in propounding the questions and soliciting the answers for the reason that, in the consultation with the court, he claimed that evidence of other offenses was admissible, and cited *People* v. *Gentekos,* 118 Cal.App. 177, 181 [4 P.2d 964], in support of his contention. In that case the appellant insisted that the admission in evidence of the conversation with the investigator about a previous fire was prejudicial error. The court held that since its purpose was not to prove a similar offence but to rebut contradictory statements made by the defendant to other investigators, it was not prejudicially erroneous. In the instant case there is evidence that defendant did state to the investigators that he never before had had a fire. The prosecutor may have proceeded in good faith, believing such evidence was admissible for the limited purpose of impeachment. Although it may be charitable to assume that this evidence was elicited in the manner described, only for the purpose of impeachment, we are not prepared to hold, where one interpretation results in a finding of bad faith and another a finding of good faith, that the prosecution was acting in bad faith and that prejudicial error resulted.

■ Error is claimed to have been committed by the district attorney in asking questions, for impeachment purposes which were based on a typed statement that defendant had previously made, taken down by a shorthand reporter, but which had not been signed by the defendant. His counsel insisted that he, or the defendant, be allowed to examine the paper before any questions were propounded. The refusal to submit such a statement for inspection was not error. (*People* v. *Singh,* 136 Cal.App. 233, 243 [28 P.2d 416].)

■ After the proper foundation was laid, it was not error to allow the shorthand reporter to read to the jury, from her notes, the statement made by defendant and his wife, prior

to trial, which statements were of an impeaching nature. (*People* v. *Mar Gin Suie*, 11 Cal.App. 42, 55 [103 P. 951]; *People* v. *Vatek*, 71 Cal.App. 453, 474 [236 P. 163].)

■ Defendant offered a so-called alibi instruction reading in part: ". . . if . . . you have a reasonable doubt whether or not the defendant was present at the time the crime was committed, he is entitled to an acquittal." The court refused the requested instruction apparently on the theory that since it was the prosecution's contention that the fire was started around 4:30 a. m., and since defendant admitted being there about that time such an instruction was unnecessary.

The whereabouts of the defendant at the time of the discovery of the fire was immaterial, if in fact he were present at the time it was started. It was established by the evidence and defendant admitted that he was present in his shop about 4:30 a. m. at which time it is claimed by the prosecution that the fire was set. While the instruction might have been properly worded so as to cover the contention made by defendant, it lacked the necessary qualifications in order that it could be applicable to the instant case.

In *People* v. *Wilson*, 100 Cal.App. 428 [280 P. 137], the instruction there contained the additional qualifications that if the jury believed that defendant was not present at the time it was *alleged or proven* that the crime was committed, and therefore *could not have committed the crime*, and did not *aid or abet in its commission*, you should find him not guilty.

The instruction here under consideration merely told the jury that if the defendant was not present at the time the crime was committed he was entitled to an acquittal. Such is not a full statement of the law. The instruction proffered lacked the additional qualifications required. A defendant might not be actually present at the time of the commission of the offense of arson and still aid and abet in its commission, or might set a fire and not be present at the time it was discovered.

In *People* v. *Gourdin*, 108 Cal.App. 333 [291 P. 701], it was held that an alibi instruction must be a *proper* instruction in relation to said defense of alibi and that it was not error to refuse a proffered instruction on that subject when it was not shown that defendant was at another place than that where the crime was committed at the time in question. No prejudicial error resulted in the failure to give the instruction as proffered.

 It is charged that the trial judge forced a verdict of guilty to be returned by the jury. This claim is based on the fact that during the two days of deliberation of the jury it returned two times informing the court that it could not agree upon a verdict. Each time the trial judge offered to or did have read certain evidence requested and then explained that due to the length of the trial and the questions involved it was only natural that a considerable length of time might be required in considering all of those questions involved. Counsel for defendant then moved for a mistrial on the ground that further deliberation, under the atmospheric conditions prevailing, would be forcing a compromise verdict. This motion was denied. It does not affirmatively appear that the jurors were forced to arrive at a verdict of guilty. The conditions related might just as well have forced a verdict of not guilty. There was nothing said by the trial judge involving any intimation as to any opinion of the court as to how the jurors should decide the case. The remarks made were fair and guarded and made for the commendable purpose of having the jury labor honestly and faithfully to arrive at a verdict, if possible, and thus terminate the litigation. Accordingly, the claim of defendant is untenable. (*People* v. *d'A Philippo*, 220 Cal. 620, 628 [32 P.2d 962]; *People* v. *Selby*, 76 Cal.App. 715, 720 [245 P. 792]; *People* v. *Phillips*, 120 Cal.App. 644, 658 [8 P.2d 228].)

 Lastly, on a motion for new trial defendant presented an affidavit of one of the jurors claiming that two other jurors ''indicated'' that they would agree with that juror and would cast their vote as he did; that when he switched his vote and voted ''guilty'' the other two did likewise. Defendant's counsel had the two other jurors in court and stated that they would be willing to so testify. The trial court properly rejected the affidavit and the proffered testimony on the ground that it would be impeaching their verdict, after they had been polled and indicated that their individual verdict, as to this defendant, was guilty. (Code Civ. Proc., § 657, par. 2; *People* v. *Denton*, 22 Cal.App.2d 673 [72 P.2d 191].)

Counsel for defendant recognizes the general rule that a juror may not impeach his own verdict but claims the facts related by defendant come within the exception specified in section 1181, subdivision 4 of the Penal Code, on the theory that the verdict was arrived at by lot or chance or by means other than a fair expression of opinion on the part of the jurors.

There is no indication that the juror making the affidavit resorted to lot or chance in casting his vote. His excuse was that he wanted to go home to his wife. The only proffered evidence is that the other two agreed or ''more or less'' agreed or ''indicated'' that they would vote as he did. Even if true, this is not a resort to lot or chance as decided in *People* v. *Kromphold,* 172 Cal. 512, 524 [157 P. 599]. There 11 jurors voted for the death penalty. The single juror concluded that if on a subsequent ballot 11 still adhered to their former vote he would yield, change his vote from life imprisonment to the death penalty, which was done. The Supreme Court declared that such change of vote was not a resort to chance, and upheld the trial court's order refusing to receive an affidavit disclosing these facts in evidence.

We have read the record and conclude that no prejudicial error exists which would justify a reversal.

Judgment and order affirmed.

Barnard, P. J., and Mussell, J., concurred.

A petition for a rehearing was denied May 10, 1950, and appellant's petition for a hearing by the Supreme Court was denied May 26, 1950. Carter, J., Traynor, J., and Schauer, J., voted for a hearing.