[Crim. No. 694.    Fourth Dist.    Dec. 20, 1950.]

THE PEOPLE, Respondent, v. ROBENA HAYS, Appellant.

Daly B. Robnett for Appellant.

Fred N. Howser, Attorney General and Elizabeth Miller, Deputy Attorney General, for Respondent.

GRIFFIN, J.—Defendant was convicted by a jury of the crime of arson. In April, 1949, defendant secured fire insurance in the sum of $4,500 on a home located in Corona, comprising rooms numbered on a diagram in evidence as 1 to 10 inclusive. Title to the property was formerly in the

name of defendant's son, who, with defendant, was one of the cobeneficiaries of the policy. The house was leased to a Mr. Keys, who resided in it from April, 1949, to November, 1949. During that period defendant listed the property for sale at $6,500, which price was later quoted at $5,500. When Keys moved out he left no boxes, newspapers or rubbish in any of the rooms, and it remained in that condition up until the time of his last inspection, which was about January 3, 1950.

On January 5, 1950, defendant came to Corona from her home in Santa Clara, where she lived with her husband. She stayed in the Corona house on the nights of January 5th and 6th. On January 7, defendant's insurance agent received a telephone call from defendant informing him she discovered she had only $4,500 insurance on the property and that she wanted $1,500 additional. The agent notified the head office to increase the insurance accordingly, effective January 7, 1950. Defendant spent the night of January 9th with a friend in Corona.

A neighbor, living next door to defendant's property, testified he saw defendant carry an amber colored gallon bottle into the house on January 6th and saw her again at the house on the morning of January 10th; that he saw lights in the back part of the house about 6 p. m. that night; that he retired about 9 p. m. and at 2:30 a. m. of January 11th he was awakened by flames coming from the gabled ends of defendant's house. The fire department was called. The firemen forced open the back door and saw no flames in rooms 8, 9, 3 or 4. One fireman went into room 1 and saw flames on the north wall and in a closet numbered 10. Another fireman forced open the front door and saw flames in room number 1 and saw evidence of separate fires in rooms 5, 6 and 10. There was found in room 1 an open faced gas heater, on which the valve was open and gas was coming into the house. After the fire was subdued the fire chief discovered that one of the back doors had been left open, to ventilate the house, but the screen door was still hooked.

About January 11, a deputy state fire marshal and others investigated the fire and discovered that the heaviest fire occurred in room 10, the closet, which was separated from room 1 by a door. The fire in that area had burned down through the floor and up through the ceiling, resulting in considerable fire damage to the house and roof. Directly

across from room 10, in room 1, an area about 36 inches wide had been burned on the wall. Apparently, the fire at that point started from the floor and burned up, since the baseboard was entirely gone and the fire plate at the top of the area was not burned away. There was a rug on the floor of room 1 and it was unharmed except for a few small holes where cinders had burned.

On the wall of room 5 was a charred area and in front of that area there was a box containing burned newspapers and a small hole had been burned through the floor under the box. Behind the box a part of the plaster had been removed. The area of that fire extended up the wall about 18 inches. The laths that showed were only charred and no hole was burned through the ceiling above this fire. The door between rooms 1 and 5 had been charred on the side of room 1 but not so on the side of room 5. The officer testified that this fact indicated the door had been closed during the fire.

On the wall of room 6, a closet opposite the fire area in room 5, there was another fire area. A cardboard carton was there found partially demolished by the fire, which also contained burned papers. There was a hole in the wall directly above that carton, as in the other room, and in between some of the exposed laths some newspapers had been stuffed which were slightly scorched by the fire. The scorched area above the carton resembled that described in room 5. In another portion of room 6 was a pile of debris consisting of paper, a mop, cloth, and a milk container, all of which carried a strong odor of petroleum products. Directly in back of the debris the plaster had been broken off of the wall. The debris had not burned.

In the opinion of duly qualified experts, who testified at the trial, there was no communication or connection between the fire causing the charred condition in room 5 and the burned areas in rooms 10 and 1, nor between the burned area in room 6 and the burned area in rooms 10 and 1, nor between the fires causing the burns in rooms 5 and 6.

A couch and mattress were found on top of a trailer located in the garage. In a conversation with defendant on that day defendant said that these articles had been in the house but she was taking them to Santa Clara with her. She was asked as to the title to the property and she said her son had advanced money to her when she first bought the house so she had the insurance written in the two names; that she stayed at the house on the night of January 7 and found it in such

a dirty condition she wanted to clean it; that the party her husband had leased his chiropractic business to did not intend to exercise his option to buy it in March of 1950; that she called her husband and he told her to get the house in shape and they would move back to Corona and occupy it; that when the investigator told her he understood they had just bought a place "in San Jose," defendant said: "We have just a deposit on it"; that she told him the insurance on the Corona home had been $4,500, and that in April, when it was to be renewed, she then asked the agent to increase it to $6,000 and that she did not know it had not been so increased until January 7, 1950, and that she then called the agent about it. She told the investigator that on January 10, she purchased two gallons of cleaning solvent to clean the rugs and other parts of the house, and that on that day the gas man came and connected the gas heater and lit it; that she stayed around most of the afternoon cleaning the walls with the solvent and had not used the mop but had used a sponge; that that evening about 7:30 she left the house locked and the heater on and went to Los Angeles; that she returned on January 11, and found the house had burned. She explained that area number 10 was a closet in which she kept her cleaning rags and sponge and that she had closed the door thereto before leaving.

On January 12th she was questioned by the district attorney. She stated she did not feel like answering questions; that "she was no fool and knew that she did not have to answer unless she wanted to." He told her that from the information he had received he understood the fire was of criminal origin and that since she was the last person known to have been there he would like to ask her some questions. She told substantially the same story as related to the investigator except she said she obtained only one gallon of cleaning fluid on January 7th and two gallons on January 10th; that in January, 1946, she had paid back the money her son had loaned to her and he had given her a deed to the property but that she had not recorded it; that she and her husband had purchased a house in "Santa Clara" for $18,000, paying $8,000 down and assuming a mortgage as to the balance; that the property was out of escrow and they were in full possession of it. When asked about the carton of burned debris in the house she said the former tenants had left it in room 5.

The expert then testified that it would be possible for a fire to smolder in a closet the size of room 10 for several hours before developing into a large fire, if the door were closed.

At the trial defendant testified that the plaster in back of the fire area in room 6 had been broken accidentally when the house was being remodeled; that the hole which was in room 6 behind the unburned debris was there when she moved into the house; that she came to Corona on January 5; that on January 8, she learned that cleaning solvent would clean the walls and that on January 9, she obtained two gallons of that solvent (she claimed that the service station man told her that it "would not burn"); that she got a sponge and cleaned the walls in rooms 2 and 5, and that she dropped some solvent on the floor; that she obtained some papers and spread them along the edge of the wall; that when she was through for the day she carried the two jugs into the closet (room 10) and while putting them down the full one smashed against the other one and broke; that she mopped up the solvent with the mop, shut the door and went to dinner; that the next morning she picked up the broken glass, mopped up the closet, and aired the house; that she got a box from the garage and placed the papers, which were covered with solvent, in the box; that as she was carrying the box into room 5 she ran against the door and a piece of the baseboard fell down; that to keep mice from coming in she propped the baseboard up with the box and dumped the papers and other things she had been using for cleaning purposes into it; that she went to a friend's house and remained there until 6:20 that evening; that she then returned to her house for some bedroom slippers; that she left the gas stove burning low in room 1 and went to Los Angeles and returned about 12:30 on January 11.

The service station man, from whom she bought the solvent, testified that he had not told her it "would not burn." An electrician testified that in his opinion the electric wire found hanging in room 6 had not arced and had not caused the fire at that point.

Defendant first argues that under the evidence no corpus delicti was shown nor established; that the prime element thereof is proving, beyond a reasonable doubt, the "criminal origin of the fire, and that it was not an accident or from natural causes," citing *People* v. *Bispham,* 26 Cal.App.2d 216 [79 P.2d 166]; 6 C.J.S. 749, § 29; and *People* v. *Walden,* 75 Cal.App. 565 [243 P. 25]; and that extrajudicial statements of a defendant cannot be used to establish any necessary elements of the corpus delicti of a crime, citing *People* v. *Vertrees,* 169 Cal. 404, 408 [146 P. 890]; and *People* v. *Quarez,* 196 Cal. 404 [238 P. 363].

■ It has been repeatedly held that incendiary origin of a fire is generally established by circumstantial evidence such as the finding of separate and distinct fires on the premises. (See *People* v. *Sherman,* 97 Cal.App.2d 245, 249 [217 P.2d 715], and cases cited.) Here, there is evidence of four separate and unrelated fires occurring in the house in question; that holes were found in the plaster behind two of the fires; that boxes of combustibles were in front of such holes; that papers had been stuffed between the laths in one of the holes; and that debris smelling of petroleum products was near another hole in the plaster. The facts produced amply justify an inference that the fire was of incendiary origin, and was neither accidental nor from natural causes, and that the jury could reasonably infer that the fire was wilfully and maliciously set for the purpose of burning the house. The corpus delicti of the crime was sufficiently established.

■ Defendant appears to contend that the evidence of the corpus delicti was insufficient because it was not shown that defendant was present when the fire was set, nor were the means by which the fire occurred shown. The connection of the defendant with the crime is no part of the corpus delicti. (*People* v. *Ward,* 134 Cal. 301, 307 [66 P. 372]; *People* v. *Flores,* 34 Cal.App. 393, 394 [167 P. 413].) ■ The identity of the defendant as the person who committed the crime may be proved by circumstantial evidence tending to connect her with the crime. (8 Cal.Jur. p. 36, § 154.) Such circumstantial evidence may consist of proof of motive and conduct of the defendant which tends to connect her with the crime, and statements which show a consciousness of guilt. (*People* v. *Bauman,* 39 Cal.App.2d 587, 592 [103 P.2d 1020]; *People* v. *Tom Woo,* 181 Cal. 315, 328 [184 P. 389].)

■ Subsequent to the fire, the defendant made numerous inconsistent statements. The jury was justified in believing the testimony of Mr. Keys that the defendant had offered the house for sale for $5,500, and that it had not been sold. This fact, coupled with the fact that she had secured an increase in the insurance to $6,000 on January 7th, three days before the fire, justifies the inference that she had a motive in burning the building and collecting the insurance. ■ While there was no direct evidence introduced showing the method whereby the fires were started, whether by matches, candles, or similar devices, this fact is not fatal to the establishment of the corpus delicti. Sufficient evidence was introduced to

support a finding that the fires were lit and that the defendant lit them. Her exact method of so doing was not a necessary element of the People's case. These facts established also rebut the presumption that the fire was caused accidentally or from natural causes.

The next complaint is that the court gave an instruction (CALJIC Instruction No. 30) as modified, that if the jury found that there was an occasion when defendant, under conditions which fairly afforded her an opportunity to reply, failed to make a denial and made evasive statements, in the face of an accusation, the circumstance of her conduct may be considered against her as indicating an admission that the accusation thus made was true, citing *People* v. *Wochnick*, 98 Cal.App.2d 124 [219 P.2d 70, 73].

If there is any evidence to support these facts there is no error in the giving of such an instruction. (*People* v. *Kynette*, 15 Cal.2d 731 [104 P.2d 794]; *People* v. *Sanchez*, 35 Cal.App. 2d 231, 235 [95 P.2d 169].) Here, on the day following the fire, the defendant was at the office of the district attorney in response to his request that she answer some questions. She gave answers to all of his questions regarding her activities, and at the conclusion of the conference, he said: "From the information I have, I am satisfied this is a criminal fire. I am accusing you of setting fire." The defendant responded to this direct accusation by saying: "What would I set the fire for, if you think I did set the fire to get insurance, I can write a check now for $10,000." The evidence supports the action of the trial court in giving such an instruction and leaving to the jury the question of its applicability.

Defendant next complains of an instruction given in the language of CALJIC Instruction No. 29-C Alternate, as suggested in CALJIC Instruction No. 29-C. Since it is not claimed that defendant ever confessed to the crime charged, the instruction, as given, correctly states the law in reference to an admission, and the refusal to include the word "confession" in the instruction was proper. (*People* v. *McMonigle*, 29 Cal.2d 730 [177 P.2d 745].)

The jury was properly instructed as to the necessary elements of the offense charged. No error resulted in instructing the jury that it was not necessary that the building involved be completely destroyed.

Defendant next claims that the giving of an instruction in the language of section 7, subdivision 4 of the Penal Code, defining malice, was error. The argument is that the

section is a general section and that it has no application to this case, and accordingly could have misled the jury. We see no merit to this contention. The same result obtains as to another instruction claimed to be erroneously given pertaining to the proving of arson by circumstantial evidence.

Lastly, defendant complains that the court erroneously refused to give several instructions requested by her in reference to the burden and quantum of proof required in reference to proving that defendant wilfully and maliciously set fire to the building. These proffered instructions were sufficiently covered by instructions given and were, accordingly, properly refused. (*People* v. *Eggers,* 30 Cal.2d 676, 688 [185 P.2d 1].)

We have examined the entire record of the evidence and of the instructions given and refused. We are convinced that there was sufficient substantial evidence of defendant's guilt, that the jury was fairly instructed as to the law, and that no prejudicial error occurred.

When defendant was arraigned for judgment the court suspended further proceedings and granted her probation. Since no judgment was pronounced or entered, the attempted appeal therefrom is dismissed. (*People* v. *Jones,* 36 Cal.2d 373 [224 P.2d 353] ; *People* v. *Guerrero,* 22 Cal. 2d 183, 184 [137 P.2d 21].)

The order denying a new trial is affirmed.

Barnard, P. J., and Mussell, J., concurred.