THE PEOPLE OF PUERTO RICO, Plaintiff and Appellee, v. EFRAÍN LEBRÓN LÓPEZ, Defendant and Appellant.

Nos. CR-66-250, Decided June 26, 1968.
CR-66-251,
CR-66-252.

Enrique Miranda Merced, Edna Abruña Rodríguez, and E. Armstrong Watlington for appellant. J. B. Fernández Badillo, Solicitor General, and Irene Curbelo, Assistant Solicitor General, for The People.

PER CURIAM: Efraín Lebrón López was accused and convicted by a jury of the commission of three offenses: murder in the first degree, attempt to kill, and violation of the Explosives Act (§ 12, 25 L.P.R.A. § 492). According to the evidence presented, defendant, together with Benjamín del Valle and Manuel Medina Rucci, contrived and planned the death of Ramón Elías Cancel, by placing on the night of October 2, 1963, a homemade time bomb under the driver's seat of said Elías Cancel's automobile. Said bomb exploded at 7:00 a.m. the next day. Elías Cancel was killed and María Isabel Villegas, an invitee, was hurt. The prosecuting attorney presented evidence to establish that the motive of the crime was the judgment of acquittal entered in the case where Elías Cancel was accused of attempt to kill and bearing of weapons, resulting from an incident between the latter and the defendant in this case. On appeal, defendant assigns the commission of nine errors by the trial court, to wit:

"*First Error:* The trial court erred in permitting the prosecuting attorney to prove the result of the proceedings which had been previously filed in Humacao, against Ramón Elías Cancel and Efraín Lebrón López, by means of secondary evidence, without it having been shown that the best evidence could not be obtained.

"*Second Error:* The trial court erred in varying the logical order of the evidence to permit the prosecuting attorney to present evidence concerning certain alleged extrajudicial statements produced by an alleged coconspirator without it having

been previously established that at the time of the alleged statements a conspiracy was under way and they were in aid thereof.

"*Third Error:* The trial court erred in failing to decide that the alleged extrajudicial statements made by Benjamín del Valle Cruz, alleged coconspirator, were not admissible against Efraín Lebrón López, and in failing to so instruct the jury.

"*Fourth Error:* The trial court erred in failing to decide that the alleged conspiracy had not been proved and in failing to instruct the jury on this point.

"*Fifth Error:* The trial court erred in reserving the decision, as to the motion for peremptory acquittal presented by the defense on the ground that the alleged accomplice's testimony had not been corroborated for the purpose of connecting the defendant with the offenses charged, and in failing to sustain said motion.

"*Sixth Error:* The trial court erred in permitting the prosecuting attorney to impinge on the jury's functions, by means of supposedly hypothetical questions and their answers.

"*Seventh Error:* The trial court erred in permitting the prosecuting attorney to conduct an impressive experiment before the jury, under the pretext of illustrating the hypothetical testimony of an expert, without it being warranted by the evidence.

"*Eighth Error:* The trial court erred in admitting the verdicts, even when the same were contrary to the evidence and contrary to law.

"*Ninth Error:* The trial court erred in giving the instructions to the jury."

■ (1) Appellant alleges that the trial court erred in permitting the prosecuting attorney to prove the result of the proceedings previously filed in Humacao against Ramón Elías Cancel, by means of secondary evidence, without having shown that the best evidence could not be obtained. He refers to the error challenged as to the testimony offered by witness Selenia González widow of Elías, in relation to the fact that Elías Cancel was found not guilty in the criminal proceeding held against the latter on September 4, 1963. In that respect, Margaro Lebrón, witness for the defense,

also testified, and he also testified that defendant Efraín Lebrón was convicted of the offense of carrying weapons when he was prosecuted for facts related to the same incident which gave rise to the prosecution of Elías Cancel. On examination by the defense, the latter witness testified the following:

"Q. Do you know Efraín Lebrón?
A. I know him.
Q. What relation do you have with Efraín?
A. He is my son.
Q. Did you know Elías Cancel?
A. Yes, sure.
Q. Do you remember any incident which occurred in relation to him?
A. Yes, madame, sure.
Q. As a result of that incident, did you have to go to some place?
A. I had to go to court every time he went to court during the trial, I went with him.
Q. During the trial, with whom, I mean, against whom?
A. Against Elías Cancel.
Q. Against Elías Cancel?
A. Aha.
Q. And what relation did your son Efraín have with that proceeding?
A. That he was the one who, he, so that the other was the defendant in a case.

JUDGE:
Q. Witness, when you say that the other, to whom do you refer?
A. To the other man.
Q. What is his name?
A. Elías Cancel.
Q. That Elías Cancel was what?
A. The defendant.

MRS. CRUZ:
Q. And Efraín?
A. Efraín was a witness.
Q. In that proceeding which you have just mentioned?

A. Yes, madame.

Q. On the day that proceeding was held, where were you?

A. In the courtroom, in court.

Q. Whom were you with there?

A. With him.

JUDGE:

Q. With whom?

A. With Efraín Lebrón." (See Tr. Ev. of Nov. 25, 1964, at 603–604.)

". . . . . . . ."

PROSECUTING ATTORNEY [Mr. Juan]:

Q. Is it true or not that as a consequence of said incident which you mention, your son was also accused?

A. Well, what do you mean, whether I . . . was he also accused?

Q. No, sir, apparently you did not understand my question; you say there was an incident between your son and Cancel.

A. Yes, sir.

Q. And as a consequence of said incident, Cancel was accused.

A. Yes, sir.

Q. And my question is whether as a consequence of that same incident, in which Cancel was accused, is it true or not that your son was also accused?

A. Of carrying weapons.

Q. Then, the other question I am going to ask you, what was the outcome of that trial against Cancel?

A. The outcome of said trial was that the court acquitted him.

Q. And your son's trial?

MR. LÓPEZ CARRILLO:

Objection, because the outcome of the trial, if any, is proved by the certified copy of the judgment of the court, if there is any judgment.

JUDGE:

Overruled.

PROSECUTING ATTORNEY [Mr. Juan]:

Q. What was the outcome of that trial of your son?

A. The outcome of my son's trial for carrying weapons was given in court.

Q. And what was the judgment?

A. He was found guilty of carrying weapons.

PROSECUTING ATTORNEY:

That is all with the witness, Your Honor.

JUDGE:

Defense.

MR. LÓPEZ CARRILLO:

Q. Do you know whether he was sentenced for that offense, for any?

A. No, sir.

Q. Do you know whether the prosecuting attorney asked him, whether, while prosecuting attorney Bird was preparing the evidence, your son conferred with him, do you know whether prosecuting attorney Bird prepared the evidence in that case of Cancel?

A. I do not know about that.

Q. You do not know whether Bird prepared the evidence in the case where Cancel was acquitted?

A. I do not know how he prepared it, you know, I know he was acquitted.

Q. And do you know about the incident, what was it about; what happened to your son in the incident?

A. My son, Elías Cancel, had fired four shots at him.

Q. Where?

A. On his back.

Q. And was Cancel acquitted?

A. Yes, sir." (See Tr. Ev. of Nov. 28, 1964, pp. 608–611.)

We understand that if any error was committed in relation to the objected matter, it was cured by the testimony of Margaro Lebrón, witness for the defense.

(2) (3) (4) We shall discuss jointly the second, third, and fourth errors, because all three are related to the conspiracy alleged by the prosecuting attorney. Appellant maintains that the trial court erred in varying the logical order of the evidence in permitting the prosecuting attorney to call Lydia Sánchez to the witness stand to testify on the extrajudicial

statements made to her by Benjamín Cruz in the presence of the defendant, without previously establishing that at the time the alleged statements were made, a conspiracy was under way and the statements were in support thereof. In *People* v. *Beltrán*, 18 P.R.R. 908, 913 (1912), we said in this respect:

"The order of the testimony is discretionary in the court even in cases of conspiracy, as shown by the following cases:

'Where evidence had been given, tending to prove conspiracy, it was not necessary that conspiracy should be actually shown to have been formed before declarations of either conspirator can be proven. If conspiracy is not ultimately proved, such declarations must be disregarded; it is largely in discretion of court as to how much evidence of existence of conspiracy shall be required before receiving evidence of acts and declarations of one of alleged conspirators in absence of other. (*People* v. *Daniels*, 105 Cal. 262, 265; 36 Pac. Rep. 720.)'

"Although the general rule is that no testimony of the conspirators shall be admitted until the conspiracy shall have been previously established, the court has power to vary the order of the evidence on this point, since this rule is not mandatory; and whenever it is warranted by the circumstances, the action of the court varying said order shall be upheld. (*People* v. *Donnolly*, 143 Cal. 394, 398, 77 Pac. Rep. 177)."

Later, in *The People* v. *Díaz et al.*, 22 P.R.R. 177, 190, 191 (1915), we said:

"The said assignments *b* and *c* involve the objection that Ramón Jiménez was allowed to testify without any independent evidence of the existence of the conspiracy having been first introduced. However, the order in which the evidence may be admitted is discretional with the court, especially when, as in this case, the trial is not by jury; and while it is true that independent evidence of the commission of the offense of conspiracy is generally required before a conspirator is allowed to testify to the acts and conversations of his coconspirators, this rule is not so absolute that the court may not vary it."

In California, where the order of the evidence is regulated in cases of conspiracy, the same conclusion has been reached. *People* v. *Compton*, 123 Cal. Rptr. 403 (1899); *People* v. *Henry*, 86 C.A.2d 785, 195 P.2d 478 (1948); *People* v. *Griffin*, 98 C.A.2d 1, 219 P.2d 519 (1950). See, also, 2 Wharton, Criminal Evidence 219, § 442 (1955); I Conrad, Modern Trial Evidence, Vicarious Admissions 420, § 523 (1956).

■ As may be clearly seen, altering the order of the evidence rests on the sound discretion of the trial court, especially when the evidence of the case is so interrelated that it is practically impossible to separate it. Such is the evidence of the case at bar.

■ It must be kept in mind that to prove the offense of conspiracy is one thing, and to establish a conspiracy as a prerequisite to the admission of the extrajudicial statements of a coconspirator, is another thing.

In the case of *State* v. *Thompson*, 139 N.W.2d 490, 502 (1966), it was stated:

". . . It was not therefore necessary to prove the conspiracy beyond a reasonable doubt, prima facie proof was all that was required to let in evidence of a coconspirator's acts and declaration, done or made in furtherance of the common purpose, to implicate any other coconspirator.

". . . The distinction must be kept in mind between proving a conspiracy as a crime, where proof beyond a reasonable doubt would be required, and establishing a conspiracy as a prerequisite to the admission of statements of alleged coconspirators, where a prima facie showing is sufficient."

■ Appellant also attacks the admission in evidence of the extrajudicial statements made by Benjamín del Valle to Lydia Sánchez, because it is hearsay evidence. The statements in question were made by Benjamín at the time Lydia was going to board defendant's car. According to the transcript of evidence, the facts were as follows:

"MR. JUAN [Prosecuting Attorney]:

Then . . . .

Q. You say that on October 2, about 10:00 or 10:30 p.m., you saw Benjamín del Valle?

A. Yes, sir.

Q. And did you see Efraín Lebrón?

A. Yes, sir.

Q. Did you see anybody else who attracted your attention at that time?

A. Manolín was with them.

Q. Manolín Medina?

A. Yes, sir.

Q. And where did you see them first?

A. At Bar El Alcázar, where I work.

Q. When you said, yesterday, that Benjamín had invited you to his apartment, did you say that it was when Benjamín visited Bar El Alcázar, the second time?

A. Yes, sir.

Q. Did you go to the apartment?

A. Yes, sir.

Q. In what vehicle did you go to the apartment?

A. In Efraín's car.

Q. Efraín's?

A. Yes, sir.

Q. And do you mean the defendant?

A. Yes, sir.

. . . . . . . .

Q. Who were riding in the vehicle?

A. Manolín, Efraín, Benjamín, and I.

Q. When you were going to board said vehicle, when you left Bar El Alcázar, what happened to attract your attention?

A. When I was going to board the vehicle, on the rear part, there was a package on the floor.

Q. That is, on the floor, on the rear part of the vehicle where you were riding?

A. Yes, sir.

Q. And what happened, if anything, when you were going to board the vehicle, in relation to said package?

A. When I was going to board the vehicle, I was going to step on it and Benjamín told me. . . .

MR. LÓPEZ CARRILLO:

Wait a moment, we are going to object.

JUDGE:

Objection sustained at this time.

PROSECUTING ATTORNEY [Mr. Juan]:

Q. When you were going to board said vehicle, who were inside the vehicle, if there was anyone?

A. Manolín and Efraín.

Q. And where, in the vehicle, was Efraín?

A. Efraín was on this side.

Q. When you say on this side, what side, the driver's seat?

A. He was the driver.

Q. Do you mean Efraín?

A. Yes, sir.

Q. The defendant herein?

A. Yes, sir.

. . . . . . . .

Q. When you went into the car, witness, I ask you, what happened, if anything, when you went in, what did you notice?

A. I saw the package on the floor.

Q. And what happened in relation to that package, if anything, when you saw that package and you were getting into said vehicle?

A. When I was getting into the vehicle I was going to step on it and Benjamín told me. . . .

MR. LÓPEZ CARRILLO:

Objection. . . .

JUDGE:

The objection is sustained at this time.

PROSECUTING ATTORNEY [Mr. Juan]:

Q. Witness, when you say you were going to step on said package, where was Efraín at that time?

A. He was on the front seat.

Q. Of the vehicle?

A. Yes, sir.

Q. And where was the package?

A. On the rear part.

Q. Of the same vehicle?

A. Yes, sir.

Q. And when you were going to step on said package, what happened, if anything did happen?

A. Well, Benjamín told me. . . .

MR. LÓPEZ CARRILLO:

Objection.

JUDGE:

Objection overruled.

MR. JUAN [Prosecuting Attorney]:

Q. What happened, if anything, when you were going to step on said package?

A. Benjamín told me: 'Be careful not to step on it, because it can explode and all of us will be sunk,' Benjamín told me."

(See Tr. Ev. of November 24, 1964 at pp. 453–457.)

Appellant indicates that such statements were not part of the res gestae, they were not statements admitted by silence, they were not imputable to the defendant under the doctrine of statements of coconspirators, and they were not the best evidence. We understand that the trial court did not err in admitting extrajudicial statements. The trial court was extremely scrupulous requiring evidence as to where the defendant was at the time the statements were made. We believe that such statements were admissible on the ground that they complied with the requirements of extrajudicial statements of a coconspirator as we established in *People* v. *Castro*, 75 P.R.R. 630, 639 (1953):

"Acts and extra-judicial declarations of coconspirators—or of co-defendants who commit a crime with a common design—are admissible in evidence against their fellow-defendants, provided (1) the record contains some independent evidence connecting the latter with the conspiracy or common design, and (2) the acts and statements of the coconspirators occurred during the course and in furtherance of the conspiracy."

Analyzing the evidence presented we find that there was sufficient evidence of the existence of a conspiracy. We turn now to examine the evidence chronologically. Selenia Gon-

zález widow of Elías, the victim's wife, testified to that respect as follows:

"PROSECUTING ATTORNEY [Mr. Oquendo]:

Q. Madame, did you see Efraín Lebrón López at that trial?

A. Yes, Mr. Prosecuting Attorney.

Q. What, if anything, occurred in relation to Efraín Lebrón López, which attracted your attention, in the course of the trial?

A. That while climbing the stairs of the court, there, in Humacao, climbing the stairs I heard when he said that if my husband, Ramón Elías Cancel, was acquitted, he would take revenge in his own hands, one way or the other." (See Tr. Ev. of November 18, 1964 at p. 41.)

Examined by the prosecuting attorney, Prosecuting Attorney Bird then testified:

"Q. Do you remember having had any conversation with this man?

A. Yes, sir, I had several conversations with him, specifically as to. . . .

Q. Was there any conversation which attracted your attention?

A. Yes, during the 12:00 o'clock recess he approached me and asked me why we did not reduce the case for carrying weapons, from § 8 to § 7, in order that the judge, instead of the jury, would intervene in the case.

Q. And after that, do you remember having had any conversation?

A. Well, when I told him that I could not do that because the principal case was attempt to kill, and § 7 implied that the weapon was unloaded, and that therefore, automatically, the case of attempt to kill would fall; that I should not worry, that he had to find a way to take revenge because he knew that he was going to be acquitted."

Witness Emeterio Rivera Silva, who was the person in charge of the building where Benjamín del Valle lodged, also testified. His testimony was in the sense of having seen the defendant together with Benjamín and Manuel, in front of

his car on Borinquen Ave. Then, Bartola Rucci testified the following:

"Q. How long was the defendant in your house?

A. He stayed overnight.

Q. Shall I understand, then, that he slept in your house?

A. He slept in a house which I had under my care, and I made a bed for him there in the house, and he slept there.

Q. Bartola, if you permit me, where is your house?

A. In Vieques.

Q. Did anything occur during defendant's stay in your house?

A. Like what?

Q. Then, let us see if we can be more specific. Do you know what took defendant to your house?

A. Well, he went out with my son, and when they returned to my house, he sat on a chair.

Q. Who is he?

A. Efraín Lebrón sat on a chair and Manuel Medina, my son, gave him a jar containing a yellow thing, then, my son went to water a colt he has, and I asked Efraín, I asked my son, what was that, before he left, and he said. . . .

. . . . . . . .

Q. Did you have any conversation in relation to the defendant?

A. I did.

Q. With the defendant?

A. Yes, sir.

Q. What was the conversation about?

A. I . . . when . . . I asked him what he wanted that dynamite for, the one inside the jar.

Q. What, if anything, did the defendant answer?

A. That he wanted it for fishing.

Q. Anything else that you talked about with the defendant?

A. I asked whether he knew how to explode that dynamite, and he said yes; I also asked him where did he go fishing, and he did not answer that question; he stood up from the chair and went to the porch because I had asked him other questions, whether he had a fishing boat, whether it was a motor boat, and he answered yes, that it was, but when I asked him where he had the boat, he stood up from the chair and went to the

porch; he did not answer and I thought that it was a foolish question.

. . . . . . . .

JUDGE:

Q. What attitude, if any, did the defendant assume while you were asking questions?

A. He was thoughtful and always looking this way, afar, with a long thought, like this." (See Tr. Ev. of November 20, 1964, at pp. 236–239.)

Benjamín del Valle, the coauthor, also testified, in synthesis, that he lived at 1976 Borinquen Avenue, that when he returned from his work on the afternoon of October 2, 1963, Efraín was waiting for him; that together they went up to his apartment and later they went to La Perla to look for Manuel. After they found Manuel, the three went to dine at a restaurant; then they went to Bar Alcázar, and there he arranged a date with Lydia Sánchez, to pick her up later; that from there they went to take a ride; that then they went for Lydia and the four of them went to his apartment. When they were there he went up with Lydia, while Efraín and Manuel waited for him. Later, they took Lydia back and then they returned to his apartment; that there Manuel and Efraín fiddled with some instruments; that they were a battery, a clock (alarm), and a jar with some fuses; that after some hours had passed, about 2:30 a.m., they started for Humacao in Efraín's automobile. When they arrived there they went to Extensión Roig to Elías' house, and following Efraín's indications they knew which was Elías' car; that Manolín opened the door of the car and he placed the battery, the clock, and the glass jar under the driver's seat. After finishing the described operation, they returned to his apartment in San Juan. (See Tr. Ev. of November 23, 1964, pp. 312–323.)

From the foregoing it appears that a conspiracy to kill Elías Cancel was proved, the extrajudicial statements made

by the coconspirator, Benjamín del Valle, being admissible while the conspiracy was under way. The second, third, and fourth errors assigned were not committed.

 (5) In the first place appellant alleges that the trial court erred in reserving the decision of the motion for judgment of acquittal, since Rule 135 of the Rules of Criminal Procedure only grants said power at the close of all the evidence, but not when the motion is presented after the evidence on either side is closed.[1] In his brief appellant assigns that such practice is prejudicial to the defendant. If the evidence for the defense creates a bad image of the defendant, and the judge, at the end, submits the case to the jury, the latter might bring in a verdict impressed by the evidence for the defense. Although it is true that there was no objection to such action, we agree that the trial court should have decided such motion at the time it was presented.[2] We understand, however, that such action was harmless, especially when the motion for judgment of acquittal did not lie, since the testimony of accomplice Benjamín del Valle was fully corroborated.[3] There was evidence in the record which connected the defendant with the commission of the offense, without taking into consideration the accomplice's testimony.[4]

██ (6) (7) Appellant maintains that the trial court erred in permitting: that the prosecuting attorney, through witness Gilberto García Monje, impinge on the jury's functions.

---

[1] See Rule 135 of the Rules of Criminal Procedure (1963):

"If a motion for judgment of acquittal is made at the close of all the evidence, the court may reserve decision on the motion, submit the case to the jury, and decide the motion either before the jury has returned a verdict or after it has returned a verdict or has been discharged without having returned a verdict."

[2] See 4 Orfield, Criminal Procedure Under the Federal Rules 672, Rule 29 (1967).

[3] See Analysis of the Evidence, p. 14.

[4] See Rule 156, Rules of Criminal Procedure (1963).

He also alleged that the court erred in permitting the expert witness to conduct an impressive experiment in the presence of the jury. First, we understand that in this case expert García Monje was limited to explaining how he would prepare a bomb, having the materials which, according to the evidence presented,[5] were used in this case. The jury's functions were not impinged.[6] We further understand that the fact that the witness himself had stated that the preparation of said bomb did not require special skill, did not make this matter one of general or public knowledge. The fact that only a basic knowledge is required to prepare a time bomb (homemade), like the one used in this case, cannot create a presumption of knowledge in an ordinary jury. The norm or test which governs the admissibility of the evidence of opinion according to Wigmore, is the following:

"In practice, therefore, when an inference is offered, two principles have to be applied. We first ask . . . is it a topic as to which the witness as such needs a special experience above the ordinary, and if so, has he this? When this question has been settled in favor of the witness, we ask . . . Does the jury

---

[5] See the testimony of Israel Castellanos, on the residue of the dry cell (battery), of the alarm clock found in the victim's car. (Tr. Ev. of November 20, 1964, pp. 145–218.)

[6] See VII Wigmore, Evidence 17–18, § 1920:

"A phrase often put forward as explaining why the testimony we are concerned with is excluded, declares that the witness, if he were allowed to express his 'opinion,' would be 'usurping the functions of the jury.'

"This phrase is made to imply a moral impropriety or a tactical unfairness in the witness' expression of opinion.

"In this aspect the phrase is so misleading, as well as so unsound, that it should be entirely repudiated. It is a mere bit of empty rhetoric. There is no such reason for the rule, because the witness, in expressing his opinion, is not attempting to 'usurp' the jury's function; nor could if he desired. He is not attempting it, because his error (if it were one) consists merely in offering to the jury a piece of testimony which ought not to go there; and he could not usurp it if he would, because the jury may still reject his opinion and accept some other view, and no legal power, not even the judge's order, can compel them to accept the witness' opinion against their own."

need any inference from the witness, either because of his skill or because his observed data cannot be adequately reproduced by him?"[7]

This case went by that test. In the second place, we understand that the trial court did not err in permitting the experiment conducted by the expert, witness García Monje, in the presence of the jury.

Before the experiment was conducted, the trial judge duly warned and instructed the jury as follows:

"Colleagues, we understand that before proceeding, the court wishes to instruct the ladies and gentlemen of the jury, that you shall not take into consideration or understand that the demonstration which the witness will perform was what actually occurred; this demonstration will merely and exclusively serve to clarify the oral statements made by the witness as to the manner described by him, in which the different elements could be mixed, on the basis of the question made by the prosecuting attorney; the demonstration is for the purpose of clarifying the witness' testimony offered a few minutes ago, but you must not, by any means, assume that what the witness is demonstrating is what actually occurred, is that clear?" (See Tr. Ev. of November 24, 1964, pp. 488–489.)

[redacted] We do not believe that the trial court has arbitrarily used its discretion, which in these cases it may exercise.[8] The experiment was solely conducted for the purpose of

---

[7] Wigmore, Evidence, *supra* at p. 23.

[8] Section 95 of the Law of Evidence of March 7, 1905, provides:

"Whenever an object, cognizable by the senses, has such a relation to the fact in dispute as to afford reasonable grounds of belief respecting it or to make an item in the sum of the evidence, such object may be exhibited to the jury or its existence, situation, and character may be proved by witnesses. The admission of such evidence must be regulated by the sound discretion of the court."

Section 1954 of the Code of Civil Procedure of California, from which the preceding section was copied, has been construed in the sense that the trial court shall have discretion to grant permission to conduct an experiment before the jury. See *Willoughby* v. *Zylstra,* 5 C.A.2d 297, 42 P.2d 685 (1935); *Martin* v. *Angel City Baseball Ass'n,* 3 C.A.2d 586, 40 P.2d 287 (1935).

showing the simplest and plainest manner in which the elements involved in this case could have been mixed, the residues of which were found in the victim's car. In California, in a case of a conspiracy to commit acts of sabotage, it was permitted to conduct an experiment to demonstrate, as herein, a chemical reaction, and the court stated:

"The action of the court in permitting an expert witness for the prosecution to conduct an experiment before the jury for the purpose of demonstrating the flame reaction and other dangerous qualities of metallic potassium is assigned as prejudicial error. It is contended that no foundation was laid for the admission of such evidence, and further that there is no evidence that such substance was ever used by the conspirators. The metallic potassium was admissible in evidence since it had been identified as the actual substance which the conspirators had acquired for use in furtherance of the objects of the conspiracy. [Citations] It was entirely within the discretion of the trial court to permit the evidence of the experiment, for it was conducted under substantially similar conditions to those which were shown in evidence and the result of the experiment was clearly material."[9]

■ (8) (9) As to the eighth error, we understand that the alleged conspiracy was proved and likewise the testimony of the accomplice or coauthor Benjamín del Valle was corroborated and, therefore, the verdicts of the jury were not contrary to law or to the evidence. The ninth error was not committed either, since, considered as a whole, we find that the instructions to the jury were correct at law and sufficient to place the jury in a position to return a fair and impartial verdict. During the course of its instructions to the jury, the trial court emphasized several times that the defendant should be presumed innocent; that any doubt should be resolved in his favor; that the people was bound

---

[9] *People* v. *Black*, 45 C.A.2d 87, 103 (1941). See also, *People* v. *Sherman*, 97 Cal. App.2d 245 (1950) ; *People* v. *Skinner*, 123 Cal. App.2d 741 (1954).

286

to prove his guilt beyond a reasonable doubt; and that their duty was to decide on the basis of the evidence presented and not on the summary made by the court. (See Tr. Ev. of December 2, 1964, at pp. 27–29, 84–97.) The trial court did not err in referring to Benjamín del Valle as coauthor or accomplice, since this is a question of law which should be determined by the court, it being incumbent on the jury to consider whether or not his testimony was corroborated. In relation to the corroboration required, the court was extremely explicit and punctilious in its instructions. (See Tr. Ev. of December 2, 1964, at pp. 74–78.) As to the instructions on the concept of possession under the Explosives Act, we understand that the latter were sufficient. (See Tr. Ev. of December 2, 1964, at pp. 8–9.)

The judgment appealed from will be affirmed.

Mr. Chief Justice Negrón Fernández did not participate herein.