[Crim. No. 3257.   First Dist., Div. One.   Mar. 14, 1957.]

THE PEOPLE, Respondent, v. CHARLIE PIERSON,
Appellant.

Charlie Pierson, in pro. per., and J. Fred Haley, under appointment by the District Court of Appeal, and Haley & McInerney for Appellant.

Edmund G. Brown, Attorney General, and Clarence A. Linn, Assistant Attorney General, for Respondent.

PETERS, P. J.—Defendant was charged with incest, statutory rape, and contributing to the delinquency of a minor. The last count was later dismissed by stipulation. The jury acquitted the defendant on the rape charge and convicted him on the incest charge. From the judgment entered on the verdict, and from the order denying his motion for a new trial, the defendant appeals.

There were several prior trials resulting in jury disagreements. On the present appeal Pierson challenges the sufficiency of the evidence, challenges one instruction, contends that the prosecuting attorney was guilty of prejudicial misconduct, and urges that he was not granted the speedy trial guaranteed to him by law.

The offense allegedly occurred on Saturday, April 30, 1955, in the home where the defendant lived with his family, including the prosecuting witness, his daughter Ruby, a child then 11 years of age. In the afternoon of that day the mother and

father of Ruby left the house, leaving Ruby and the other children at home. Ruby was watching television in the living room. With her was a neighbor boy, her 7-year-old brother, and two sisters, aged 10 and 4 years, respectively. Ruby's testimony, on direct examination, was reasonably clear and coherent. She testified that, after her father and mother had left the house, her father returned alone, went into the kitchen, and beckoned to her to come to that room. She went out to the kitchen, and then her father went into the bathroom, called to her, and she followed. The bathroom door was partly open, and remained so, during the events about to be described. She testified that defendant stood her against the bathroom wall, pulled down her panties, zipped open his pants, and then ''put his private parts into mine.'' In about 10 minutes defendant lifted the witness and sat her on the face bowl with her head against the mirror. She had grease on her hair and some of this came off on the mirror. She was holding the soap dish so hard that it broke.

The witness also testified that when her mother came home later that day the mother asked the witness about the grease on the mirror and the broken soap dish. The witness then denied any knowledge about them, but two days later told her mother all about what had happened.

The witness also testified that on some eight or nine prior occasions the defendant had forced her to have intercourse with him. The first time occurred at some indefinite time in the past when her mother was in the hospital. On that occasion the event had occurred in her mother's bed and she bled on the bed. She testified that the defendant had told her that he would kill her if she told anyone about these events.

On cross-examination some major inconsistencies between her direct examination and her testimony on prior trials were developed. She first said that she did not remember what time it was when her father returned to the house, but later testified that she had looked at the clock, and it was 3 p. m. She also said that her four-year-old sister came into the bathroom while intercourse was occurring, and then left. All during the event the bathroom light was on and the door half open. After her father had finished with her she returned and watched television. She did not tell her brother or anyone else about what had occurred until she told her mother two days later.

She was uncertain whether her father had left the house

after the events testified to, but in an earlier trial had testified that he did not leave the house. Also on an earlier trial she had testified that she had changed her story about her father staying at home after the intercourse, because her mother had told her that she was wrong.

On a prior trial she had testified that on the day she had told her mother about the events here involved, her mother started to talk to her about sex; that she got the idea about her father from talking with her mother and "adopted all" her mother had then said. On the present trial she could not recollect having so testified.

Although she had testified on direct examination that her father had had intercourse with her on eight or nine prior occasions, until she told her mother about the events of April 30, 1955, she had never told anyone about these occurrences. She admitted that on the day before she told her mother about the assault, she was "angry" with her father, and had argued with him.

The 10-year-old sister of Ruby, Barbara, testified that she and the other children were watching television on April 30, 1955, when her father returned to the house, and went into the kitchen; that Ruby then went into the kitchen; that she thereafter looked through the open door to the kitchen and did not see Ruby or her father; that sometime later Ruby appeared and again began to look at television; that then her father left the house, apparently to pick up her mother. On cross-examination she conceded that her view into the kitchen was not completely unobstructed.

Defendant's wife, who had once been convicted of an assault with a deadly weapon, testified that about a year before the alleged offense she had been required to go to the hospital; that when she left, there were clean sheets on her bed; that when she returned the sheets were stained with what looked like blood.

She also testified that on the afternoon of April 30, 1955, her husband had taken her downtown; that shortly after 3 p. m. they had parted company upon his representation that he would be back in a few minutes; that he failed to return and she took a bus home, and when she got off the bus there was her husband, who rode her and a neighbor home. She immediately discovered the grease on the mirror and the broken soap dish, but no one seemed to know how they had occurred; that she had washed Ruby's hair the night before and there was grease on it. She was by no means clear as to

how and when Ruby had first told her of the incident, but was certain that after she talked with Ruby she had called the police. She denied that she and her husband had quarreled prior to the report to the police. She admitted that before she had gone to the hospital she was bleeding from her private parts and was by no means positive that she might not have caused the stain she found when she returned.

A doctor testified that he examined Ruby on May 4, 1955, four days after the alleged offense occurred. He testified that Ruby's "vagina was dilated or enlarged to a size that would indicate that something had dilated the vagina, that is, it was comparable to that of an adult woman"; that the condition he found usually resulted from sexual intercourse; that he found no spermatozoa; that it was "very" possible to find spermatozoa within four or five days of intercourse, but it was "very frequent" not to find spermatozoa after that length of time. The hymen was not intact.

Appellant admitted that he had left home with his wife on the afternoon of April 30, 1955, leaving the children, including Ruby, at home. He testified that he parted with his wife in downtown Oakland, agreeing to pick her up later; that he picked up two neighbors and drove them home and then picked up a boy named "Sonny"; that with Sonny in the car he drove to his own home and went in, leaving Sonny in the automobile with the motor running; that he simply went into the house to urinate, which he did, and came out after being in the house not over three minutes. He denied that Ruby was in the kitchen or bathroom with him, and denied ever having had intercourse with her. After leaving the house he testified that he picked up his wife and returned home. It is of some significance that "Sonny" was not produced as a witness by appellant, although, if appellant's story is true, Sonny could have furnished powerful corroboration.

He explained the stained sheets in the bed by testifying that about a year before the alleged offense his wife had gone to the hospital because of a miscarriage, and before she left home she had stained the sheets with her blood. He also claimed that in the week before the alleged offense he had had several arguments with his wife, who had threatened to "fix" him, and had several arguments with Ruby. This was denied by his wife, but partly corroborated by Ruby. He claimed that he had broken the soap dish on the 29th of April.

On cross-examination the prosecuting attorney brought out

numerous inconsistencies between appellant's story on the present trial and his testimony on the prior trials.

This is a fair summary of the basic evidence introduced. The three major witnesses against appellant were, of course, Ruby, the doctor, and appellant's wife. Appellant argues that Ruby's story was a fabrication dreamed up by his wife, and that the testimony of his wife and Ruby was inherently improbable. It is argued that it is inconceivable that even the most depraved person would commit an act of incest in a bathroom with the light on and the door open when there were several children watching television in an adjoining room. This was, of course, a jury question. We are not permitted to weigh the evidence. The jury saw and heard these witnesses. The jury, properly instructed, elected to believe the prosecution's witnesses and to disbelieve defendant. This was the jury's province and is not the function of the appellate court. (*People* v. *Klinkenberg,* 90 Cal.App.2d 608 [204 P.2d 47, 613] ; *People* v. *Daugherty,* 40 Cal.2d 876 [256 P.2d 911] ; *People* v. *Kessler,* 62 Cal.App.2d 817 [145 P.2d 656].) Under the facts of this case we cannot hold that the testimony of Ruby and of appellant's wife is inherently improbable.

The court gave an instruction on the legal effect of defendant's claimed admission. The instruction reads as follows :

"Evidence has been received in this case tending to show that on occasions other than this trial the defendant himself made statements tending to prove his guilt of the alleged crime for which he is on trial. These are claimed to be admissions.

"An admission is something less than a confession in that it does not concede so much pointing toward defendant's guilt, and does not alone, even if true, support a deduction of guilt. It may consist of any statement or other conduct of a defendant whereby he expressly or impliedly acknowledges a fact that contributes in some degree to the proof of his guilt of an alleged crime for which he is on trial, and which statement was made or conduct occurred outside of that trial."

Appellant does not object to the form of this instruction but does claim that the giving of it was erroneous and prejudicial because there was no evidence of an admission by him. This contention is erroneous. Appellant, following his arrest, gave a three-page statement to the arresting officers. In this statement he admitted that he returned home on the day of

the alleged offense, and admitted that he had come into the house and went into the bathroom. These admissions place appellant in the house when Ruby testified he was there. He admits going into the bathroom where the alleged offense occurred. These were all admissions of facts that contributed, in some degree, to the proof of the prosecution's case. Therefore, the challenged instruction was proper. (*People* v. *Powell*, 83 Cal.App. 62 [256 P. 561]; *People* v. *Hays*, 101 Cal.App.2d 305 [225 P.2d 600].)

Appellant next contends that the district attorney was guilty of prejudicial misconduct. ▮ It is, of course, the general rule that when the acts complained of are of such a character that an instruction to disregard them would have obviated any prejudice, the failure to request an appropriate instruction precludes appellate consideration of the alleged misconduct. (*People* v. *Hampton*, 47 Cal.2d 239 [302 P.2d 300].) This rule precludes consideration of several of the claimed acts of misconduct. ▮ For example, the district attorney, in his argument, after reviewing the facts, then asked the jurors what their respective spouses would say to them if they failed to convict under those facts. Appellant's counsel interrupted, stating that he thought this was "improper" argument. The court stated: "I think it is beyond the bounds of proper analysis." The prosecuting attorney immediately desisted and proceeded to another subject. No instruction to disregard this argument was requested. The remarks were not seriously prejudicial. In the absence of a request for an instruction the error, if any, was not prejudicial.

Appellant also objects to the fact that the district attorney several times referred to the testimony of Ruby's sister, Barbara, as "damaging" to the defendant, and contends that this was a misstatement of the record. Neither objection nor a request for an instruction was made. Moreover, in a very real sense, the testimony of Barbara was damaging to appellant. She placed Ruby and the appellant in the kitchen together when Ruby said they were together, and then testified that the two were at least out of her sight during the period Ruby testified she was with appellant in the bathroom. This was "damaging" to appellant because he had testified that Ruby was in the living room at all times that he was in the house.

▮ The last contention in reference to misconduct has to do with the discussion by the district attorney of penalties during his argument. He stated that appellant conceded he

was Ruby's father, which was the fact, and that for that reason a conviction on the rape count would be a compromise verdict; that he did not intend to argue on that count; that "for all practical purposes you don't even have to consider the statutory rape"; that a conviction of rape would, in effect, permit the jury to decide the penalty; that "actually . . . there is nothing that would prevent the defendant in a statutory rape from remaining out of jail for any time because, of course, he can be given probation." Appellant's counsel then objected and the court agreed. The district attorney followed with: "Very well. If I am wrong, the Court will instruct you that I am wrong. But I say to you, ladies and gentlemen, that there is nothing in the Penal Code that says that this defendant ever has to spend as much as one day in jail. Now, if that is improper, then I——" Defendant objected again and the judge instructed the jury to "disregard that portion of Counsel's argument."

In view of the instruction given by the court we cannot hold that this argument was prejudicially erroneous. All that the argument amounted to was a request to forget about the lesser charge, and to concentrate on the more serious charge. This could not have been prejudicial.

The last major contention of appellant is that the trial court erroneously denied a motion to dismiss a prior trial which motion was made, so it is claimed, when a prior retrial was continued without good cause more than 60 days after the last mistrial. He states that a mistrial occurred in September, 1955, and he asserts that a motion under section 1382, subdivision 2, of the Penal Code was made on December 5, 1956, and denied.

These alleged facts are not disclosed by the record on appeal. The record shows that the amended information was filed on October 31, 1955. Arraignment was November 3d and by consent trial was set for November 16th. Then the record shows there was a trial which ended in a mistrial on December 20, 1955. Another jury was selected on February 20, 1956. Pursuant to motion by the People, and over the objection of defendant, the matter was continued to February 23d. On that date it appears that, because appellant's wife was ill, the People again moved for a continuance and the case was continued to February 28th. On that date, at the request of appellant's counsel, the trial was continued to February 29th, and commenced on that date. This is all that the reporter's or clerk's transcripts disclose.

The attorney general quite properly pointed out in his reply brief that the record does not show a mistrial in September of 1955, nor does it show any motion to dismiss or its denial on December 5, 1955. No effort to augment the record was made. ■ The attorney general correctly relies on the rule that failure of the record to show a denial of a proper motion to dismiss in the trial court amounts to a waiver, and precludes appellate consideration of the point. (*People* v. *Newell,* 192 Cal. 659 [221 P. 622] ; *People* v. *Jordan,* 45 Cal.2d 697 [290 P.2d 484].)

It should also be pointed out that the record shows the filing of an amended information on October 31, 1955. The challenged December trial was within 60 days of the filing of that amended information. ■ It seems to be the rule that the 60-day period is reinstated not only by a mistrial (*Ex parte Ross,* 82 Cal. 109 [22 P. 1086]), but by the filing of a new or amended pleading, whether or not a new or different charge is involved. (See generally *People* v. *Dawson,* 210 Cal. 366 [292 P. 267] ; *In re Begerow,* 136 Cal. 293 [68 P. 773, 56 L.R.A. 528] ; *Muns* v. *Superior Court,* 137 Cal.App.2d 728 [290 P.2d 951] ; *People* v. *Vacca,* 132 Cal.App.2d 8 [281 P.2d 315] ; *People* v. *Cryder,* 90 Cal.App.2d 194 [202 P.2d 765] ; *People* v. *Romero,* 13 Cal.App.2d 667 [57 P.2d 557] ; *People* v. *Godlewski,* 22 Cal.2d 677 [140 P.2d 381].) Thus, even if the record were augmented, it would not appear that a reversal would be required.

The judgment and order appealed from are affirmed.

Bray, J., and Wood (Fred B.), J., concurred.