Filed 4/28/20

<u>CERTIFIED</u> <u>FOR</u> <u>PARTIAL</u> <u>PUBLICATION</u>*

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(El Dorado)

----

| | |
|---|---|
| THE PEOPLE, | C083291 |
| Plaintiff and Respondent, | (Super. Ct. No. P13CRF0444) |
| v. | |
| ANGEL MARIE ASHBEY, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of El Dorado County, Kenneth J. Melikian, Judge. Affirmed as modified.

Valerie G. Wass, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Michael P. Farrell, Senior Assistant Attorney General, Carlos A. Martinez, Darren K. Indermil, Supervising Deputy Attorneys General, Kari Ricci Mueller, Deputy Attorney General, for Plaintiff and Respondent.

---

* Pursuant to California Rules of Court, rules 8.1105 and 8.1110, this opinion is certified for publication with the exception of parts II through VI of the Discussion and the concurring and dissenting opinion.

1

Defendant Angel Maria Ashbey briefly lived with two others in a secluded house in a forested area. Toward the end of her stay, Ashbey struck one of her roommates in the head with a pipe until he lost consciousness, poured gasoline over him, and threw several lit matches in his direction—though none caught fire. After her roommate managed to escape, she set several fires in the house and four more on the forested land around the house. A jury convicted Ashbey of attempted voluntary manslaughter, arson of a structure, and four arsons of forest land. The jury also found true several enhancements relating to these offenses. The trial court sentenced Ashbey to a total of 19 years in prison.

Ashbey raises various issues on appeal. She contends (1) she should have been convicted of only one arson of forest land, not four, because she set the several fires on only one parcel of land; (2) even if her four arson convictions were proper, she should have received concurrent, not consecutive, sentences for the four arsons of forest land; (3) the court wrongly instructed the jury about attempted voluntary manslaughter and the right to self-defense; (4) the court wrongly modified one of the jury's verdict forms, which initially referred to the nonexistent crime of "attempted *involuntary* manslaughter," to refer to "attempted *voluntary* manslaughter"; (5) the abstract of judgment mistakenly refers to each of the four arsons of forest land as an arson of a structure; (6) the abstract of judgment mistakenly lists the relevant court assessments; and (7) the court violated her due process rights by ordering her to pay criminal fees and fines without first finding she had the ability to pay them.

We agree the abstract of judgment should be modified for the reasons Ashbey alleges. In all other respects, we affirm the judgment. We address whether Ashbey was properly convicted of four counts of arson of forest land in the published portion of our opinion, and we address the remaining issues in the unpublished portion of our opinion.

BACKGROUND

*Factual Background*

Ashbey is a former deputy sheriff and correctional officer who, for about a year, lived in the home of her former boyfriend, Doug Bennett, in El Dorado County.

In late July of 2013, Ashbey met Timothy Maston and Melissa DeLong, Maston's caretaker, at a barbeque hosted by a mutual friend.[1] Both Maston and DeLong were then looking for a new place to live and, at Ashbey's suggestion, they considered joining Ashbey at Bennett's home—a two-story house set on a large tract of over five acres in a grassy and forested area.

Maston and DeLong met Bennett a few days after about the home. Bennett, who was living in Redwood City at the time, showed Maston and DeLong the home and shortly after agreed the two could stay there. But he informed them that Ashbey could not, as the two had recently broken up. After he left, however, Ashbey returned to the house and told Maston and DeLong that she "didn't care what he sa[id]"; she "had more right there than him." And so she continued to live at Bennett's house, now with Maston, DeLong, and DeLong's dog staying there too.

After a few days at the house, DeLong purchased a cake, gifts, and balloons on learning it was Ashbey's birthday. She then went into her bedroom to set up what she had purchased to surprise Ashbey, but as she was doing so, Ashbey attempted to enter her bedroom. After DeLong managed to block her from entering, Ashbey began yelling that DeLong was trying to hide something from her. A few minutes later, DeLong opened the door to show her she was only trying to hide the birthday surprise. But Ashbey said nothing, walked out, and slammed the door on her way out.

---

[1] Maston at the time suffered from various complications from his diabetes, including kidney disease, poor eyesight, and according to DeLong, difficulty walking.

Because of Ashbey's behavior, which made DeLong "feel really uncomfortable," DeLong prepared to leave the house the following day. To that end, she began packing Maston's and her belongings into their car. But after talking with Bennett over the phone, who assured her that Ashbey would leave, DeLong decided to stay at the house a little longer.

Later that same day, Ashbey called DeLong and apologized for her earlier behavior. She then asked DeLong to pick her up. DeLong agreed, drove to Ashbey's location, and then brought her back to the house. Shortly after, DeLong helped Maston into the bedroom to lay down because he was not feeling well, and then set out for the grocery store to pick up dinner for her, Ashbey, and Maston.

But on returning home no more than an hour later, DeLong found the house and surrounding area in flames. She asked a neighbor to call 911 and, after entering the home, found her dog inside a burning room. But she could find neither Maston nor Ashbey.

Emergency responders arrived shortly after and attempted to extinguish the house fire and several vegetation fires on the property. One of the responders later found Maston, his face bloodied "like he'd been hit," downhill from the house. Maston was afterward taken to the hospital where he remained for the next two weeks. According to hospital records, he suffered a frontal sinus fracture, a nasal fracture, a clavicle fracture, a small hemorrhage in part of his brain, and complex lacerations on his forehead and nose. He later received surgery for his injuries to close his wounds, remove small bone fragments, and repair a large bone fragment that had become dislodged.[2]

---

[2] According to the parties' stipulation, Maston had amphetamine in his system at the time he was admitted to the hospital, and admitted using methamphetamine about twice a month.

At the hospital, Maston told a detective that Ashbey had caused his injuries. According to Maston, he had told Ashbey he planned to have a cigarette, and asked if she cared to smoke too. After she said no, he started heading outside. But before he made it outside, Ashbey struck him in the back of the head with a PVC pipe with a "big steel knuckle" attached at the end, causing him to fall to the floor.[3] She then struck him again in the head while he was on the ground, causing Maston to, he believes, briefly lose consciousness. The next thing he remembered he was outside on the pavement. While he lay on the pavement struggling to move, woozy from the blows to his head, Ashbey poured gasoline on him and threw several lit matches in his direction. But none of the matches reached him. Maston eventually managed to escape Ashbey and hid behind a door in the house. After hiding there for a period of time, he headed back outside and saw Ashbey lighting a fire near the driveway to the house. He then headed toward the back of the house but, on his way over, fell and rolled down a slope away from the home. After he came to a stop, he hid behind a bush until DeLong returned from the grocery store.

Two other detectives later sought to speak with Ashbey about these events, but she proved difficult to locate. A few days after the fire, still having not found her, the detectives obtained a search warrant and traced her phone to the home of one of Ashbey's friends in Grass Valley. But at the time the detectives arrived, the friend said Ashbey had left 30 minutes before, though he agreed to notify the detectives if he saw her again. Four days after, the detectives received an anonymous tip noting that Ashbey was again at the friend's house in Grass Valley and would soon be leaving in a silver car. Following the tip, the detectives visited the area and shortly after found a car matching

---

[3]     The detective found a PVC pipe matching Maston's description in the house, describing it as a PVC pipe with a metal valve screwed on the end.

the description provided. In the driver's seat of the car was the same friend who earlier agreed to notify the detectives the next time he saw Ashbey. After asking the driver whether anyone else was in the car and not receiving a response, the detectives searched the car and found Ashbey hiding under clothing in the backseat. They arrested her at that time.

Ashbey afterward denied setting the fires and gave conflicting explanations about Maston's injuries. At first, she claimed she never hit Maston with a PVC pipe and never poured gasoline on him. She asserted instead that Maston had pushed her to the floor following an argument, and that they then physically fought—but not with a PVC pipe. But later on, she conceded she hit Maston in the head with the PVC pipe with the metal valve attached at its end, though she maintained that Maston had pushed her first. She added that she hit him in the head again with the pipe only after he kept coming after her. After hitting him this second time, she further alleged, she threw a rock at Maston as he continued to chase her, Maston hit her below the knee with the same PVC pipe she had used, and she then threw a cup of gasoline and unlit matches at Maston to prevent him from chasing her further. She also discussed the fires but denied setting them. In her account, she ran to a trail near the house after the fight with Maston, fell asleep on the ground shortly after, and then awoke surrounded by smoke.[4]

Two firefighter investigators later attempted to determine the cause of the fires. One focused on the house. He found the fire had been started in two areas—the front door and the master bedroom—and had been deliberately started and accelerated by the use of gasoline. Another investigator inspected the outdoor fires. He ultimately

---

[4] In support of Ashbey's version of the events, one of Ashbey's friends said she had seen Ashbey's injuries and taken photographs of them two days after the fires. But the alleged photographs were never offered in evidence.

identified four separate outdoor fires that, in his opinion, were not caused by one another but rather were started separately by arson. All four of the outdoor fires were adjacent to the home's driveway. Three of the fires were on the downhill side of the driveway and were contained to small areas, with two burning one-tenth of an acre and one burning one-hundredth of an acre. The fourth fire, which was on the uphill side of the driveway, burned 9.6 acres before being put out.

*Procedural Background*

Ashbey was charged with attempted first degree murder of Maston (Pen. Code,[5] § 664/187, subd. (a)—count 1), arson of an inhabited structure (§ 451, subd. (b)—count 2), and four arsons of "a structure or forest" (§ 451, subd. (c)—counts 3-6) for the four fires set around Bennett's house. She was also charged with several enhancements. The information alleged, for count 1, that her attempted murder of Maston involved the use of a deadly weapon (§ 12022, subd. (b)(1)) and personal infliction of great bodily injury (§ 12022.7, subd. (a)). It alleged, for count 2, that Ashbey set fire to the house using "a device designed to accelerate the fire or delay ignition." (§ 451.1, subd. (a)(5).) And it alleged, for the remaining arson counts, that her attempt to set fire to "a structure or forest" resulted in a firefighter suffering great bodily injury.[6] (§ 451.1, subd. (a)(2).)

A jury afterward found Ashbey not guilty of attempted murder. But it found her guilty of the lesser-included offense of attempted voluntary manslaughter and of the five

---

[5] Undesignated statutory references are to the Penal Code.

[6] In the course of fighting the fires, one firefighter was struck in the head by a falling branch and suffered concussion-like symptoms as a result.

7

arson counts.[7] It also found true the allegations that Ashbey used a deadly weapon, personally inflicted great bodily injury, and caused a firefighter to suffer great bodily injury.

The trial court sentenced Ashbey to state prison for a total of 19 years, consisting of six years for the first of the four arsons of a forest, five years for the enhancement based on the firefighter's injury, one year for the attempted voluntary manslaughter, four months for the deadly-weapon enhancement on the attempted manslaughter count, one year for the great bodily injury enhancement on the attempted manslaughter count, one year eight months for the house arson, and one year four months each for the remaining three arson counts.

Ashbey timely appealed.

DISCUSSION

I

*Ashbey's Four Arson Convictions for the Four Forest Land Fires*

Ashbey first contends she "was improperly convicted of three of the four counts of arson of a forest because setting fire to four areas of the same parcel of forest land at the same time constitutes only a single arson offense." We disagree.

A. *Background Law*

To address Ashbey's contentions, we must determine " '[t]he proper unit of prosecution' " for section 451. (*People v. Wilson* (2015) 234 Cal.App.4th 193, 199 (*Wilson*).) In particular, we must determine whether an arsonist who, in quick

---

[7] The verdict form initially referred to "attempted *involuntary* manslaughter," but the trial court, after conferring with counsel, changed the form to refer instead to "attempted *voluntary* manslaughter."

8

succession, sets several distinct fires to a "forest land" has committed one or several offenses under section 451.

These types of "unit of prosecution" questions, though not common, can arise in a variety of contexts. Suppose, for example, a defendant fires two shots at a rival. Two attempted murders? Or suppose a defendant punches another three times in one fight. Three batteries? Should we count the offenses by each individual act (three punches) or the course of conduct (one fight)? The resolution of these and similar questions turns on the particular statute and facts at issue. Some statutes, for example, authorize multiple convictions for similar acts committed during a single course of conduct. (*Wilson*, *supra*, 234 Cal.App.4th at p. 200.) Other statutes do not, allowing only a single conviction for a wrongful course of conduct. (*Id.* at pp. 200-201.) Our task here is to determine which of these two approaches best fits section 451.

To that end, we consider first the California Supreme Court's decisions that have touched on "unit of prosecution" questions. We start with those decisions that have treated several unlawful acts committed on a single occasion as only one offense. Take *People v. Ortega* (1998) 19 Cal.4th 686 (*Ortega*), overruled on another ground in *People v. Reed* (2006) 38 Cal.4th 1224. The court there found a defendant who steals multiple items during the course of an " 'indivisible transaction' " involving a single victim has " 'commit[ed] only one robbery or theft notwithstanding the number of items he steals.' [Citation.]" (*Id.* at p. 699.) Similarly, in *People v. Bailey* (1961) 55 Cal.2d 514, the court found a defendant who commits "a series of wrongful acts [of theft] . . . pursuant to one intention, one general impulse, and one plan" may be convicted of only one offense. (*Id.* at p. 519; but see *People v. Whitmer* (2014) 59 Cal.4th 733, 741 [if a defendant's wrongful acts are sufficiently "separate and distinct," they may still be treated as separate offenses "even if committed pursuant to a single overarching scheme"].)

In other contexts, however, the court has reached the opposite conclusion— holding that several identical unlawful acts committed on a single occasion may warrant

9

a separate conviction for each act. Consider, for example, the court's decision in *People v. Harrison* (1989) 48 Cal.3d 321 (*Harrison*). The defendant there broke into a woman's apartment and then forcibly inserted his finger into her vagina three separate times during a brief sexual assault. (*Id.* at pp. 325-326.) After each of the first two penetrations, the woman was able to pull away. (*Id.* at p. 325.) But each time the defendant overpowered her and reinserted his finger. (*Ibid.*) After he did so for a third time, the woman managed to trick the defendant into releasing her—at which point, "she scrambled into the bathroom" and locked the door. (*Ibid.*) Based on these three forced penetrations, the defendant was charged with and convicted of three counts of violating section 289, subdivision (a), which "proscribe[s] certain 'penetration[s], however slight, of the genital or anal openings of another person' by 'any foreign object, substance, instrument, or device.' " (*Harrison*, at p. 324.)

On appeal, the defendant contended that multiple digital penetrations during a brief continuous assault constitute only a single violation of section 289. (*Harrison, supra*, 48 Cal.3d at pp. 326-327.) But the Court of Appeal disagreed, and the California Supreme Court later affirmed in a decision that counted offenses in terms of acts, not intentions or courses of conduct. According to the court, because the defendant caused a proscribed penetration three separate times, with all elements of the offense satisfied each time, that was enough to find three separate "completed" violations of section 289. (*Harrison*, at p. 329.) And the court found that true even though these acts were committed against the same person during a single brief encounter. (*Id.* at p. 324.)

Several years later, in *People v. Scott* (1994) 9 Cal.4th 331 (*Scott*), the court again found several unlawful sexual acts committed on a single occasion warranted several convictions. *Scott* involved a defendant who was convicted of 14 counts of committing lewd acts against a minor—all in violation of one statute, section 288. (*Scott*, at p. 339.) Two of these convictions related to two types of lewd acts committed during a single encounter. (*Id.* at p. 340.) Two more convictions concerned two additional lewd acts

10

from another encounter. (*Ibid.*) On appeal, the defendant contended the four convictions for these two encounters should be reduced to two, reasoning that the two separate lewd acts committed on those occasions were part of one "indivisible" course of conduct. (*Ibid.*) The Court of Appeal agreed (*ibid.*), but the California Supreme Court later reversed. It found the defendant's contention that all lewd acts committed in each "indivisible" encounter were one violation was "inconsistent with the general manner in which statutory violations are calculated under the scheme." (*Id.* at pp. 344-345.) "The relevant analysis," the court wrote, "appears in *Harrison*." (*Id.* at p. 345.) The court then, relying on *Harrison*, concluded that "[e]ach individual act that meets the requirements of section 288 can result in a 'new and separate' statutory violation." (*Id.* at pp. 346-347.) "[A] more lenient rule of conviction," the court added, "should not apply simply because more than one lewd act occurs on a single occasion." (*Id.* at p. 347.)

As a final example, in *People v. Gayle* (1927) 202 Cal. 159 (*Gayle*), the court once more found that several unlawful acts—this time, several acts of forgery—committed on a single occasion warranted several convictions. The defendant there was a real estate agent who falsified the sale of three properties. (*Id.* at pp. 161-162.) For each of the properties, the defendant falsified a sales contract and a check from the purported buyer. (*Ibid.*) He was afterward charged and convicted of six counts of forgery—one count for each contract and check. (*Id.* at p. 162.) On appeal, the defendant contended he could "at most . . . be charged with three offenses and not with six," because he had only falsified materials for the sale of three properties. (*Ibid.*) But the California Supreme Court disagreed, reasoning that "the false making and forging of . . . separate instruments, although done at the same time, are separate and distinct offenses." (*Id.* at pp. 162-163.) Thus, although the defendant may only have *intended* to falsify the sale of three separate properties, his six *acts* to facilitate those three objectives, even though "done at the same time," determined the appropriate number of offenses. (*Ibid.*; see also *Wilkoff v. Superior Court* (1985) 38 Cal.3d 345, 349 ["a charge of multiple counts of violating a statute is

11

appropriate only where the actus reus prohibited by the statute—the gravamen of the offense—has been committed more than once"], superseded by statute on other grounds as stated in *People v. Arndt* (1999) 76 Cal.App.4th 387, 393-394; 1 Witkin, Cal. Crim. Law (4th ed. 2012) Elements, § 30, p. 304 ["Normally each separate act, whether violating one or more than one statute, will give rise to a separate offense. And if the necessary separateness is found, it makes no difference that the identical statute is violated with the same victim."].)

     B.    *Analysis*

With that background, we now turn to the case before us, beginning with the relevant statutory text. Under section 451, as relevant here, "[a] person is guilty of arson when he or she willfully and maliciously sets fire to or burns or causes to be burned . . . any . . . forest land," which includes "any brush covered land, cut-over land, forest, grasslands, or woods." (§ 450, subd. (b) [defining "Forest land"].) According to a longstanding interpretation of arson, " 'the burning of any part, however small, completes the offense.' " (*People v. Haggerty* (1873) 46 Cal. 354, 355; *People v. Lee* (1994) 24 Cal.App.4th 1773, 1776.)[8]

The crime of arson, in this last respect, is similar to the statute considered in *Harrison*. The court there considered a statute, section 289, that is violated "simply by causing a proscribed 'penetration, *however slight*.' " (*Harrison*, *supra*, 48 Cal.3d at p. 328.) And here we have a statute that, similarly, is violated simply by causing " 'the burning of any part, *however small*.' " (*People v. Haggerty*, *supra*, 46 Cal. at p. 355, italics added.)

---

[8]    However, the statute also makes clear, by enhancing the penalty for an arson pursuant to section 451, that the Legislature has decided that the "proximate[] caus[ing] [of] multiple structures to burn [is but a] single violation of Section 451." (§ 451.1, subd. (a)(4).)

Because *Harrison*'s holding turned largely on section 289's "however slight" language, we find this similarity significant. *Harrison*'s reasoning, again, was based on the "plain meaning" of the statute before it. (*Harrison*, *supra*, 48 Cal.3d at p. 327.) The court there considered a statute, section 289, that "made clear that the crime [of forcible sexual penetration] is committed simply by causing a proscribed 'penetration, *however slight*.' " (*Harrison*, at p. 328.) From this language, the court "conclude[d] that, assuming all other elements of the offense are present, a violation is *complete* the moment such 'penetration' occurs." (*Ibid*.) And from that conclusion, the court then found "[i]t follows logically that a *new and separate* violation of section 289 is 'completed' each time a *new and separate* 'penetration, however slight' occurs"—even when one proscribed penetration occurs immediately after another. (*Harrison*, at p. 329.)

Considering the parallels between arson's "however small" language and section 289's "however slight" language, we find *Harrison*'s reasoning dictates the result here, leaving our task only to replace the word "penetration" with the word "burning." Adopting *Harrison*'s words, the crime of arson "is committed simply by causing a proscribed '[burning], *however slight*.' " (*Harrison*, *supra*, 48 Cal.3d at p. 328.) "From this language, we can only conclude that, assuming all other elements of the offense are present, a violation is *complete* the moment such '[burning]' occurs." (*Ibid*., but see fn. 8, *ante*.) And from that conclusion, "[i]t follows logically that a *new and separate* violation of section [451] is 'completed' each time a *new and separate* '[burning], however slight' occurs." (*Harrison*, at p. 329.) Turning then to the facts here, because Ashbey set fire to and burned forest land four separate times—each time meeting the elements of section 451, which she does not deny—we conclude that she "completed" four separate violations of section 451.

In an attempt to overcome *Harrison* and similar cases, Ashbey advances several arguments. But we find none persuasive.

13

First, she notes several courts have found a defendant guilty of only one count of arson, even though the defendant set more than one fire. But that only reflects the prosecutors' charging decisions in those several cases. In each of her cited cases, the prosecution appears to have charged the defendant with only one count of arson. (*People v. Hole* (1983) 139 Cal.App.3d 431, 433; *People v. Boyd* (1978) 86 Cal.App.3d 54, 59; *People v. Adams* (1953) 119 Cal.App.2d 445, 446; *People v. Burrows* (1953) 119 Cal.App.2d 766, 766; *People v. Hays* (1950) 101 Cal.App.2d 305, 306 (*Hays*).)[9] None of these courts thus considered the question before us. We also find it significant that none of Ashbey's cited cases concerned forest land; instead, they all concerned the burning of specific objects, either buildings or cars. (*Hole*, at p. 433; *Boyd*, at p. 57; *Adams*, at p. 446; *Burrows*, at p. 766; *Hays*, at p. 307.)

Second, Ashbey contends "[a] single crime cannot be fragmented into more than one offense." That is true. (*People v. Rouser* (1997) 59 Cal.App.4th 1065, 1073 (*Rouser*).) But she never persuasively explains why her setting of several distinct fires involves only a single crime. In her effort to do so, she argues there "is only one crime of arson for each . . . forest land set ablaze," "[r]egardless of the number of points of origin." But that logic cannot be squared with *Harrison*. On similar logic, the defendant in *Harrison* should only have been convicted of one offense, for, to use Ashbey's reasoning, there "is only one crime of [forcible sexual penetration] for each [victim]," "[r]egardless of the number of [penetrations]." But that type of reasoning did not carry the day in

---

[9]    Ashbey also cites *People v. Lee*, *supra*, 24 Cal.App.4th 1773, but the defendant there did not even set multiple fires through successive acts. She instead committed only one act: she threw a firebomb into a house. (*Id.* at p. 1775.) That one act then resulted in several small fires on a carpet and a curtain. (*Ibid.*) For this one act, the prosecution in *Lee* charged the defendant with one act of arson. (*Ibid.*)

14

*Harrison*, *supra*, 48 Cal.3d at page 334, and we see no reason to treat this case differently.

Rather than discuss *Harrison* in any meaningful way, Ashbey instead cites as counterpoints *Rouser*, *supra*, 59 Cal.App.4th 1065, *People v. Coyle* (2009) 178 Cal.App.4th 209, *People v. Ryan* (2006) 138 Cal.App.4th 360 (*Ryan*), and *Ortega*, *supra*, 19 Cal.4th 686.  But each of these cases is readily distinguishable.

To begin, two of these cases concerned defendants who were charged with multiple crimes for *one* act.  The defendant in *Rouser* was convicted of three drug offenses for possessing, at *one* time, three different controlled substances.  (*Rouser*, *supra*, 59 Cal.App.4th at pp. 1067, 1073.)  And the defendant in *Coyle* was convicted of three counts of murder for killing *one* person.  (*Coyle*, 178 Cal.App.4th at p. 211.)  We would appreciate the relevance of these cases had Ashbey similarly suffered multiple convictions for one illegal act—for example, if she had set *one* fire that burned multiple buildings and had then been convicted of one count of arson for each building burned. (See fn. 8, *ante*; see also *People v. Shiga* (2019) 34 Cal.App.5th 466, 481 [arsonist who set fire to one structure could not be convicted of two counts of arson merely because the fire spread to another structure].)  But that is not the case before us.  Ashbey did not set one outdoor fire; she set four distinct outdoor fires.

Ashbey's next cited case, *Ryan*, is similarly unhelpful.  The court in *Ryan* found a defendant could not sustain multiple forgery convictions for *one* check that she fraudulently signed and then attempted to use on one occasion.  (*Ryan*, *supra*, 138 Cal.App.4th at pp. 363-364, 371.)  But notably, courts have long found a defendant could suffer multiple forgery convictions for fraudulently signing *multiple* checks, even if the defendant signed those checks at the same time.  (*Gayle*, *supra*, 202 Cal. at pp. 162-163; *People v. Neder* (1971) 16 Cal.App.3d 846, 852.)  And as *Gayle* shows, that is true even when the defendant fraudulently signs multiple documents, at the same time, in furtherance of a single objective.  (*Gayle*, at pp. 162-163.)

15

Ashbey's last cited case, *Ortega*, also offers her no support. The defendant there had stolen another's wallet, pager, and car in one " 'indivisible transaction.' " (*Ortega*, *supra*, 19 Cal.4th at pp. 690, 699.) The prosecution then charged these takings as two separate offenses—grand theft for the taking of the car, and robbery for the taking of the wallet and pager. (*Ibid.*) The defendant was later convicted on both counts. (*Id.* at p. 691.) The California Supreme Court, however, reversed, concluding the defendant should only have been convicted of one theft or one robbery, notwithstanding the number of stolen items. (*Id.* at p. 699.) That conclusion, of course, was fully consistent with the court's other theft cases. (See *People v. Bailey*, *supra*, 55 Cal.2d at p. 519 [a defendant who commits "a series of wrongful acts [of theft] . . . pursuant to one intention, one general impulse, and one plan" may only be convicted of one offense].) But again, we find *Harrison*, *Scott*, and similar cases, not the high court's theft cases, supply the relevant standard for considering whether Ashbey committed one or several arsons of a forest.

Finally, Ashbey contends affirmance would result in absurd results. In particular, she contends a defendant who lights four fires that burn separately could be convicted of four arsons, but a defendant who lights four fires that merge could be convicted of only a single arson. But we fail to see the logic in her argument. A defendant who sets four fires that merge into one very well could be convicted of four arsons. Suppose, for example, a defendant sets four houses on fire and these separate fires ultimately merge into one. That defendant could not claim she at most committed one arson simply because the four separate fires eventually merged. Ashbey provides no explanation for her contrary view.

Accepting Ashbey's view, moreover, would threaten absurd results of its own. Taking her position would mean that once an arsonist has set one fire in a forest, she may then, without further consequence, set as many additional fires as she likes to the same forest. This potential result is particularly troubling considering section 450's broad

16

definition of "Forest land."  "Forest land" includes, for example, "woods" and a "forest." (§ 450, subd. (b).)  And so, under Ashbey's reading of section 451, a defendant who successively sets multiple fires miles apart across a vast forest could be convicted of only one arson.  We cannot accept that narrow reading of section 451.  To do so, in our view, would inappropriately reward those defendants with the " 'greater criminal ambition.' " (*Harrison*, *supra*, 48 Cal.3d at pp. 335-336 [discussing sentencing].)[10]

## II

*The Court's Imposition of Consecutive Sentences for the Arson Counts*

Ashbey next asserts that, even if she was properly convicted of four counts of arson of forest land, she should have received concurrent, not consecutive, sentences for these four convictions.  She reasons the trial court offered no legitimate reason in support of its decision to impose consecutive sentences.  We disagree.

We begin with the rules governing the trial court's sentencing decision.  A judge generally must provide its reasons for "[i]mposing consecutive sentences."  (Cal. Rules of Court, rule 4.406(b)(5).)  To satisfy this requirement, "the judge must state in simple language the primary factor or factors that support the exercise of discretion."  (*Id.*, rule 4.406(a).)  Before doing so, judges must consider certain sentencing factors—namely, those listed in California Rules of Court, rule 4.425[11]—but they may rely on any

---

[10]    Although we find Ashbey was properly convicted of these four arsons, our holding is limited to the circumstances of this case.

[11]    Rule 4.425 lists three specific factors relevant to concurrent or consecutive sentencing—namely, whether (1) "[t]he crimes and their objectives were predominantly independent of each other," (2) [t]he crimes involved separate acts of violence or threats of violence," and (3) "[t]he crimes were committed at different times or separate places, rather than being committed so closely in time and place as to indicate a single period of aberrant behavior."  The rule adds that other "circumstances in aggravation or mitigation may be considered . . ., except:  [¶] (1) A fact used to impose the upper term; [¶] (2) A fact used to otherwise enhance the defendant's sentence in prison or county jail under

17

"additional criteria reasonably related to the decision being made," as long as these additional criteria are "stated on the record." (*Id.*, rule 4.408(a).)

Consistent with these requirements, the trial court below "state[d] in simple language the primary factor or factors that support[ed] the exercise of discretion." (Cal. Rules of Court, rule 4.406(a).) In particular, the court stated that "[t]he evidence is clear that these were four separately set grass fires. Each of them had a separate and distinct possibility of getting out of control and doing more damage than they did, because of the quick response of the fire department. Each of them was lit separately, each of them was lit in a different place, each of them could have gotten into a much more serious condition than occurred, so the Court will treat them as four separate fires." The court thus, in finding consecutive sentencing appropriate, found it particularly significant that Ashbey had created a separate and distinct threat with each additional fire she set. For that reason, and within the scope of its discretion, it concluded she was more culpable than had she set only one fire.

Ashbey, however, ignores the court's stated reasons for imposing consecutive sentences. Although she contends the court offered no legitimate reason in support of its decision to impose consecutive sentences, she never explains why the court's offered reason was inadequate. She instead attempts to relitigate sentencing, offering several considerations that, in her view, support a more lenient sentence. But it is not our role to independently decide sentencing matters that are within the trial court's discretion. (*People v. Jordan* (1986) 42 Cal.3d 308, 317.) Our review is for abuse of discretion, not de novo. And Ashbey has failed to show how the trial court abused its discretion in deciding to impose consecutive sentences. (See *People v. Giminez* (1975) 14 Cal.3d 68, 72 ["[I]n the absence of a clear showing that its sentencing decision was arbitrary or

section 1170[, subdivision] (h); and [¶] (3) A fact that is an element of the crime may not be used to impose consecutive sentences."

18

irrational, a trial court should be presumed to have acted to achieve legitimate sentencing objectives and, accordingly, its discretionary determination to impose consecutive sentences ought not be set aside on review."].)

III

*Ashbey's Conviction for Attempted Voluntary Manslaughter*

Ashbey next contends her conviction for attempted voluntary manslaughter must be reduced to attempted involuntary manslaughter—a crime that does not even exist. She offers two reasons in support. Her first argument focuses on the verdict form for the attempted manslaughter conviction. Her second concerns the jury instructions for attempted manslaughter. We find neither persuasive.

A.      *The Verdict Forms for Attempted Manslaughter*

We consider first her argument concerning the verdict forms for the attempted manslaughter conviction.

The prosecution charged Ashbey, in count 1, with attempted murder. The court instructed the jury on that offense, along with three lesser included offenses: (1) attempted voluntary manslaughter—heat of passion (§§ 21a, 192, 664), (2) attempted voluntary manslaughter—imperfect self-defense (§§ 21a, 192, 664), and (3) assault with a deadly weapon or force likely to produce great bodily injury (§§ 240, 245, subd. (a)). The court also provided the jury with verdict forms for murder and the three lesser included offenses. But the two verdict forms for attempted manslaughter mistakenly mislabeled the relevant offense. Both mistakenly referred to attempted *involuntary* manslaughter, rather than attempted *voluntary* manslaughter.

The court noticed the error shortly after the jury first came back with its initial verdict. Because of the error in the verdict forms, the jury found Ashbey guilty of "ATTEMPTED INVOLUNTARY MANSLAUGHTER—HEAT OF PASSION." Discussing the matter with the parties, the court offered to bring the jury back for further deliberations on the count, but counsel for both parties found it unnecessary. The

19

prosecution reasoned the jury was "properly instructed on the appropriate lesser included offense of attempted voluntary manslaughter, so I don't think there's any legal significance to the two letters in front of voluntary. Defense counsel agreed.

The prosecution also noted a separate issue requiring further jury deliberation: the jury had issued a verdict on one of the lesser included offenses for attempted murder without first finding Ashbey not guilty of attempted murder. Agreeing with the prosecution, the court directed the jury to deliberate further on the charges. After further deliberations, the jury found Ashbey not guilty of attempted murder. It then again found her guilty of "ATTEMPTED INVOLUNTARY MANSLAUGHTER—HEAT OF PASSION."

The court afterward conferred with counsel about modifying the verdict form for attempted involuntary manslaughter to refer instead to attempted voluntary manslaughter. Counsel for both parties agreed. The court then crossed out the "in" in "involuntary" and initialed and dated the modification. The court also later corrected the Penal Code citation in the verdict form to reflect the change, changing the reference from section 192, subdivision (b), to section 192, subdivision (a).

Although Ashbey's trial counsel expressly consented to these changes, Ashbey now contends her conviction "must be reduced to conform with the jury's verdict finding her guilty of attempted involuntary manslaughter." She reasons that, because of the mislabeled verdict form, "it is not clear whether the jury intended to convict appellant of attempted voluntary manslaughter." We disagree.

To begin, we find her claim forfeited. "[T]he general rule in both civil and criminal cases is that an objection to a defective verdict must be made before the jury is discharged." (*People v. Anzalone* (2013) 56 Cal.4th 545, 550; see also *People v. Jones* (2003) 29 Cal.4th 1229, 1259 [in failing to object at trial, defendant forfeited his claim to a verdict form that allegedly "was fatally ambiguous"]; *People v. Bolin* (1998) 18 Cal.4th 297, 330 (*Bolin*) [in failing to object at trial, defendant forfeited his objection to a verdict

20

form that allegedly referenced the wrong Penal Code section].)  This "requirement of an objection is premised upon the idea that a party should not sit on his or her hands, but instead must speak up and provide the court with an opportunity to address the alleged error at a time when it might be fixed." (*Keener v. Jeld-Wen, Inc.* (2009) 46 Cal.4th 247, 266, 265 [discussing "the basis for requiring objections" to "asserted imperfections in the polling of a jury concerning its verdict" and "other equally important procedural matters at trial"].)

As the Attorney General notes, Ashbey "did not merely 'sit on her hands' at trial"; rather, through her defense counsel, she "affirmatively stipulated to the court's changes to the verdict form that she now challenges."  After the court first recognized the defect in the two attempted manslaughter verdict forms, both the prosecution and defense counsel found no "legal significance" to the forms' references to attempted involuntary manslaughter, rather than attempted voluntary manslaughter.  And later, after the court proposed crossing out the "in" in involuntary after the jury rendered a verdict, both the prosecution and defense counsel consented.  We find, for this reason, that Ashbey forfeited her objection to the verdict forms.

But even if the issue were not forfeited, we would still find no prejudicial error.

"[T]echnical defects in a verdict may be disregarded if the jury's intent to convict of a specified offense within the charges is unmistakably clear, and the accused's substantial rights suffered no prejudice." (*People v. Webster* (1991) 54 Cal.3d 411, 447; see also *People v. Paul* (1998) 18 Cal.4th 698, 707 ["the form of the verdict generally is immaterial, so long as the intention of the jury to convict clearly may be seen"].)

On that principle, courts have disregarded defects in verdicts similar to that here. In *Bolin*, *supra*, 18 Cal.4th 297, for example, the court "discern[ed] no possibility of prejudice" in a verdict form that cited Penal Code section 192.1, rather than section 192, subdivision 1—an error the court characterized as "technical at worst." (*Bolin*, at p. 331.) In *People v. Camacho* (2009) 171 Cal.App.4th 1269, similarly, the court "disregarded" a

"clerical error" in a verdict form that misstated the relevant crime, mistakenly listing the crime of carjacking rather than second degree robbery. (*Id.* at p. 1272.) Reviewing the jury instructions, the information, and the prosecution's opening argument, the court wrote it "ha[d] no difficulty in determining the jury intended to find defendant guilty of second degree robbery." (*Id.* at p. 1273.) And in *People v. Trotter* (1992) 7 Cal.App.4th 363, the court disregarded a "clerical error" in a verdict form that mistakenly stated the defendant " 'was armed with a firearm,' " rather than that he "personally used a firearm," during the commission of the relevant offenses. (*Id.* at p. 369.) Considering the jury instructions, the information, and the parties' arguments, the court concluded the jury in fact intended to find that the defendant "personally used a firearm," not merely that he "was armed with a firearm." (*Id.* at pp. 369-370; see also *People v. Jones*, *supra*, 29 Cal.4th at p. 1259 [reviewing arguably ambiguous verdict form and finding the jury's intent "unmistakably clear" in light of the jury instructions, the prosecutor's arguments, and the jury's later verdict in the penalty phase of the trial].)

We reach a similar conclusion here. The trial court provided the jury with two sets of oral instructions on attempted manslaughter—one for "heat of passion" and one for "imperfect self-defense"; two sets of written instructions on attempted manslaughter—again, one for "heat of passion" and one for "imperfect self-defense"; and two verdict forms for attempted manslaughter—and once again, one for "heat of passion" and one for "imperfect self-defense." In Ashbey's view, the jury might have believed that the only two verdict forms it received on attempted manslaughter—which again, mistakenly referred to attempted involuntary manslaughter—somehow concerned offenses different from those described in the instructions it received on attempted manslaughter. But we find differently. Viewing the record as a whole, we find the jury's unmistakably clear intent was to convict Ashbey of attempted *voluntary* manslaughter—the only type of manslaughter on which the jury was instructed—rather than the nonexistent crime of

22

attempted *involuntary* manslaughter.  (See *People v. Johnson* (1996) 51 Cal.App.4th 1329, 1332 ["there is no such crime as attempted involuntary manslaughter"].)

   B.  *The Jury Instructions for Attempted Manslaughter*

  We consider next Ashbey's contentions concerning the jury instructions for attempted manslaughter.

  Attempted voluntary manslaughter (heat of passion) and attempted voluntary manslaughter (imperfect self-defense) are both lesser-included offenses of attempted murder.  The jury instructions for both provide that "[a]n attempted killing that would otherwise be attempted murder is reduced to attempted voluntary manslaughter" under certain circumstances.  (CALCRIM Nos. 603 & 604.)  Under CALCRIM No. 603, the attempted murder is reduced to attempted voluntary manslaughter if the defendant attempted to kill someone because of a sudden quarrel or in the heat of passion.  And under CALCRIM No. 604, as relevant here, the attempted murder is reduced to attempted voluntary manslaughter if the defendant attempted to kill a person because she acted in imperfect self-defense.

  Both instructions place on the prosecution the burden of disproving the circumstances that would reduce the attempted murder charge to attempted voluntary manslaughter.  The final paragraph of CALCRIM No. 603, for example, states:  "The People have the burden of proving beyond a reasonable doubt that the defendant attempted to kill someone and was not acting as a result of a sudden quarrel or in the heat of passion.  If the People have not met this burden, you must find the defendant not guilty of attempted murder."  And the final paragraph of CALCRIM No. 604, similarly, states: "The People have the burden of proving beyond a reasonable doubt that the defendant was not acting in imperfect self-defense.  If the People have not met this burden, you must find the defendant not guilty of attempted murder."  The import of these instructions is that if the prosecution fails to disprove "imperfect self-defense" or "heat of passion,"

then the jury cannot find the defendant guilty of attempted murder; at most it may find the defendant guilty of attempted voluntary manslaughter.

The trial court, however, found it proper to modify the final two words of both jury instructions, replacing the words "attempted murder" with "attempted voluntary manslaughter." As modified, the final sentence of both instructions provided: "If the People have not met this burden, you must find the defendant not guilty of *attempted voluntary manslaughter*." (Italics added.) Both parties' counsel agreed with the changes at trial. But on appeal, both now recognize the error in the modifications. And in Ashbey's view, these erroneous modifications were prejudicial.

Although we agree the court erred, we find Ashbey suffered no harm as a result. If read literally and considered in isolation, the mistaken modifications to the jury instructions could only have helped Ashbey. Under the standard instructions, if the prosecution failed to disprove "imperfect self-defense" or "heat of passion," then the jury could not find her guilty of attempted murder. But as modified, if the prosecution failed to disprove "imperfect self-defense" or "heat of passion," then the jury arguably could not even find her guilty of attempted voluntary manslaughter. The mistaken instructions thus offered Ashbey a potential windfall, and we do not see how she could have been prejudiced as a result. That is reason enough to reject Ashbey's contention. (See *People v. Carrasco* (2014) 59 Cal.4th 924, 969 [defendant not prejudiced by "erroneous instruction could only have benefitted him"].)

In any event, considering the instructions as a whole, we do not find the jury was misled by the court's modifications. (See *People v. Chavez* (1985) 39 Cal.3d 823, 830 [in reviewing alleged error in jury instructions, courts look to the instructions as a whole].) True, because of the court's changes, one sentence in the two instructions for attempted manslaughter suggested the jury could not convict Ashbey of attempted voluntary manslaughter if she was found to have acted in "imperfect self-defense" or "heat of passion." But the rest of the instructions for attempted manslaughter clarified

24

that this was not so. Both explained that the jury could in fact convict her of "attempted voluntary manslaughter" for "[a]n attempted killing that would otherwise be attempted murder" if she acted in "imperfect self-defense" or in a "heat of passion." (CALCRIM Nos. 603 & 604.) Considering the instructions as a whole, as we must, we do not find the jury was misled.

IV

*The Court's Instructions on the Right to Self-Defense*

Ashbey next alleges that the trial court, in instructing the jury using CALCRIM No. 3472, misstated the law of self-defense. CALCRIM No. 3472 provides: "A person does not have the right to self-defense if he or she provokes a fight or quarrel with the intent to create an excuse to use force." In Ashbey's view, that instruction may be appropriate in some cases, but it was inappropriate here. She reasons the instruction should have been modified, per *People v. Ramirez* (2015) 233 Cal.App.4th 940, to clarify that a person who provokes a fight with nondeadly force may still act in self-defense when the opponent escalates to deadly force. We reject her claim.

We begin with some background principles. CALCRIM No. 3472 reflects the well-established rule that " ' "the ordinary self-defense doctrine—applicable when a defendant *reasonably* believes that his safety is endangered—may not be invoked by a defendant who, through his own wrongful conduct (e.g., the initiation of a physical attack or the commission of a felony), has created circumstances under which his adversary's attack or pursuit is legally justified." ' " (*People v. Enraca* (2012) 53 Cal.4th 735, 761 [discussing the similar jury instruction in CALJIC No. 5.55, which provides that "[t]he right of self-defense is not available to a person who seeks a quarrel with the intent to create a real or apparent necessity of exercising self-defense"].)

But although the instruction "is generally a correct statement of law," it "might require modification in the rare case in which a defendant intended to provoke only a nondeadly confrontation and the victim responds with deadly force." (*People v. Eulian*

25

(2016) 247 Cal.App.4th 1324, 1334 (*Eulian*).)  In that event, the trial court may need to clarify that although the defendant may have started "a nondeadly quarrel," she has not forfeited altogether her right to defend her life.  (See *People v. Ramirez*, *supra*, 233 Cal.App.4th at p. 943.)

According to Ashbey, this is one of those "rare case[s] in which a defendant intended to provoke only a nondeadly confrontation and the victim respond[ed] with deadly force."  (*Eulian*, *supra*, 247 Cal.App.4th at p. 1334.)  And so, she maintains, the trial court needed to modify CALCRIM No. 3472 to correctly state her right to self-defense.  We disagree.  Even accepting Ashbey's testimony regarding the facts, she still has not shown that she only "intended to provoke only a nondeadly confrontation and the victim respond[ed] with deadly force."  (*Eulian*, at p. 1334.)  In her telling, Maston pushed her and caused her to fall down and hit her head on the floor, she then twice hit him in the face with a PVC pipe and threw a rock at him as he gave chase, and Maston afterward hit her below the knee with the same PVC pipe.  Maston, in sum, at one point pushed her and at another point hit her below the knee with a PVC pipe.  Even on her own version of the facts, then, she has not presented evidence sufficiently substantial to show Maston ever acted with deadly force.  (See *People v. Flannel* (1979) 25 Cal.3d 668, 684, fn. 12 [not "*any* evidence" is sufficient to warrant a jury instruction; a party instead must present "evidence substantial enough to merit" the requested instruction], superseded on other grounds by statute as stated in *In re Christian S.* (1994) 7 Cal.4th 768, 776-777.)  We thus find no merit to her contention that the trial court needed to clarify that a person who provokes a fight with nondeadly force may still act in self-defense when the opponent escalates to deadly force.

V

*Errors in the Abstract of Judgment*

In her last claim in her opening brief, Ashbey contends the abstract of judgment mistakenly describes counts 3 through 6—which concerned her four counts for "arson of

26

a forest"—as "arson[s] of a structure."  In her supplemental brief, she adds that the abstract of judgment also mistakenly lists the relevant court assessments.  We agree on both issues.

Turning first to the labeling of the offenses, the jury instructions and verdict forms show Ashbey was charged with and convicted of four counts of "arson of a forest."  But as Ashbey notes, the abstract of judgment mistakenly refers to each as involving the "arson of a structure."

The abstract of judgment also, as Ashbey contends, wrongly lists the relevant court assessments.  In particular, it mistakenly swaps section 1465.8—which imposes one type of assessment—with Government Code section 70373—which imposes another.  The former section imposes a $40 assessment per criminal conviction to help fund "court operations" (§ 1465.8, subd. (a)(1)), and the latter imposes a $30 assessment per criminal conviction to help fund "court facilities" (Gov. Code, § 70373, subd. (a)(1)).  Because Ashbey had six convictions, the abstract should have shown a $240 court operations assessment under section 1465.8 and a $180 court facilities assessment under Government Code section 70373.  But swapping the two statutes, the abstract instead shows a $240 court facilities assessment under Government Code section 70373 and a $180 court operations assessment under section 1465.8.

To correct these two errors, we remand to the trial court to prepare an amended abstract of judgment.

VI

*Fees and Fines*

Finally, in a supplemental brief, Ashbey contends the trial court violated her due process rights by ordering her to pay criminal fees and fines without first finding she had the ability to pay them.  We reject the claim.

Ashbey's argument relies on the Second District Court of Appeal's recent decision in *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*).  The court there considered

27

whether the due process clauses of the state and federal Constitutions limited a trial court's ability to impose assessments and fines on indigent defendants. It found they did. According to the court, "due process of law requires the trial court to conduct an ability to pay hearing and ascertain a defendant's present ability to pay before it imposes court facilities and court operations assessments under Penal Code section 1465.8 and Government Code section 70373." (*Id.* at p. 1164.) And, the court went on, "although Penal Code section 1202.4 bars consideration of a defendant's ability to pay unless the judge is considering increasing the [fine] over the statutory minimum, the execution of any restitution fine imposed under this statute must be stayed unless and until the trial court holds an ability to pay hearing and concludes that the defendant has the present ability to pay the restitution fine." (*Ibid.*)

Relying on *Dueñas*, Ashbey contends the trial court here violated her due process rights in imposing fees and fines without first considering her ability to pay. As she notes, in addition to sentencing her to prison for a term of 19 years, the trial court ordered her to pay various fees and fines: a $240 court assessment fee ($40 per count—§ 1465.8), a $180 criminal conviction assessment fee ($30 per count—Gov. Code, § 70373), and a $5,400 restitution fine (§ 1202.4, subd. (b)).[12] But the court never held a hearing to determine if Ashbey could pay these amounts, and, relying on *Dueñas*, Ashbey now takes issue with the court's failure to do so.

Although Ashbey's argument might be a valid one were we to follow *Dueñas*, we find, like many other courts, that *Dueñas* was wrongly decided. Most prominent of those that reject *Dueñas* is *People v. Hicks* (2019) 40 Cal.App.5th 320, review granted Nov. 26,

---

[12]    Again, as mentioned in part V of the Discussion, the abstract of judgment mistakenly refers to assessments under section 1465.8 when it should instead reference Government Code section 70373, and vice versa.

2019, S258946 (*Hicks*)—and it is a decision we find better reasoned than *Dueñas*.[13] The court there found "*Dueñas* wove together two distinct strands of due process precedent" to reach its holding. (*Id.* at p. 325.) The first, the court explained, concerned a line of precedent involving "a due process-based right of *access* to the courts." (*Ibid.*; see *Dueñas*, *supra*, 30 Cal.App.5th at p. 1166.) And the second, the court went on, concerned case precedent involving "a due process-based bar to incarceration based on the failure to pay criminal penalties when that failure is due to a criminal defendant's indigence rather than contumaciousness." (*Hicks*, at p. 325; see *Dueñas*, at p. 1167.) But the court found neither of these "two strands of due process precedent . . . dictate *Dueñas*'s rule." (*Hicks*, at p. 326.) Imposing fees and fines on indigent defendants, the court concluded, neither deprives these defendants of access to the courts nor results, by itself, in their "incarceration for nonpayment due to indigence." (*Ibid.*)

Worse, the *Hicks* court continued, "*Dueñas* does more than go beyond its foundations; it announces a principle inconsistent with them." (*Hicks*, *supra*, 40 Cal.App.5th at p. 327.) It offered in support, among other cases, *Bearden v. Georgia* (1983) 461 U.S. 660 (*Bearden*)—one of the cases *Dueñas* relied on. The Supreme Court there, the *Hicks* court noted, never suggested that a defendant's poverty should immunize the defendant from monetary punishment; it instead suggested the opposite, stating: "The State . . . has a fundamental interest in appropriately punishing persons—rich and poor—who violate its criminal laws. A defendant's poverty in no way immunizes him from punishment." (*Bearden*, at p. 669; *Hicks*, *supra*, 40 Cal.App.5th at p. 327; see also *Williams v. Illinois* (1970) 399 U.S. 235, 244 ["[t]he State is not powerless to enforce judgments against those financially unable to pay a fine; indeed, a different result would

---

[13] We may consider, as persuasive authority, the cases that have been granted review by our Supreme Court. (Cal. Rules of Court, rule 8.1115(e)(1).)

amount to inverse discrimination"].)  Finally, the *Hicks* court found, "*Dueñas* is inconsistent with the purposes and operation of probation," including the purpose of ensuring that defendants repay their debts to society.  (*Hicks*, at p. 327.)  For all these reasons, the court in *Hicks* "conclude[d] that due process does not speak to [the imposition of fees and fines] and that *Dueñas* was wrong to conclude otherwise."  (*Id.* at p. 329.)

We too, for the reasons stated in *Hicks*, find *Dueñas* was wrongly decided.  And because Ashbey's contention here is premised on our accepting *Dueñas*, we thus reject her due-process challenge to the imposed fees and fines.[14]

### DISPOSITION

We remand with directions to the trial court to prepare an amended abstract of judgment in accordance with part V of this opinion.  After doing so, the trial court must forward a certified copy of the corrected abstract of judgment to the Department of Corrections and Rehabilitation.  In all other respects, the judgment is affirmed.


_____/s/_____
BLEASE, Acting P. J.


I concur:


\_\_\_\_/s/_____
HOCH, J.

---

[14]     Because we find Ashbey's argument under *Dueñas* fails on the merits, we need not consider the Attorney General's forfeiture argument.

Mauro, J., Concurring and Dissenting.

I fully concur in the majority opinion except for part VI of the Discussion, pertaining to fines and assessments. As to that portion of the opinion, I dissent.

In *People v. Dueñas* (2019) 30 Cal.App.5th 1157, the court held it is improper to impose certain fines or assessments without determining defendant's ability to pay. (*Id.* at pp. 1168, 1172.) Although some courts have subsequently criticized *Dueñas*'s legal analysis (see, e.g., *People v. Hicks* (2019) 40 Cal.App.5th 320, review granted Nov. 26, 2019, S258946), *Dueñas* remains citable precedent. Until the California Supreme Court has had an opportunity to resolve the current split in authority, I would remand the matter to give the trial court an opportunity to consider defendant's ability to pay the imposed assessments. But as for the restitution fine and parole revocation fine imposed by the trial court, I would conclude defendant forfeited the challenge to those fines because they were imposed above the minimum and defendant had an opportunity to object to them in the trial court but did not.

                                               /s/
                                        MAURO, J.